

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00218-CR

DEREK WRYAN WILSON                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

### FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1290837D

----------

## OPINION

----------

## I. INTRODUCTION

A jury found Appellant Derek Wryan Wilson guilty of aggravated sexual assault of a child under fourteen years of age and assessed his punishment at forty-five years' imprisonment and a $10,000 fine.  *See* Tex. Penal Code Ann. § 22.021(a)(2)(B) (West Supp. 2014).   The trial court sentenced Wilson accordingly.   In a single issue, Wilson argues that the trial court erred by

admitting a portion of his video-recorded statement taken after he was in custody and without *Miranda* warnings. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

At the time of the offense, Wilson was living with his girlfriend Natalie,[1] Natalie's mother and her boyfriend, and Natalie's two daughters in Hurst, Texas. Natalie's daughter Megan was two years old, and her other daughter Amy was two months old. Natalie and Wilson were watching TV on the couch one night after Wilson got home from work, and Natalie fell asleep. She awoke to an unusual cry from Amy and turned to find Wilson holding Amy in his arms. Natalie thought that Amy might need a diaper change, so she got up and, while changing Amy's diaper, saw blood in Amy's fecal matter. Natalie changed the diaper and went back to sleep.

Natalie later got up and changed Amy's diaper again. Natalie found more fresh blood in Amy's diaper, so she told her mother. Natalie and her mother took Amy to the hospital, where Dr. Jayme Coffman found a significant tear in Amy's vagina and some bruising to her hymen. Dr. Coffman testified at trial that the tear could not have been accidental.

Detective Chad Woodside from the Hurst Police Department questioned Wilson at the hospital. Wilson did not have an explanation for Amy's injuries.

---

[1]To protect the anonymity of the children in this case, we will use aliases to refer to some of the individuals named herein. *See Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

2

About a week later, Detective Woodside asked Wilson if he would come to the police department for an interview.  Wilson agreed.

Detective Woodside and Detective J. Eubanks interviewed Wilson for approximately one hour and forty minutes.  The interview began at 2:40 in the morning.  At the beginning of the interview, Detective Woodside told Wilson that he was not under arrest and was free to leave at any time.  Wilson said that he understood.  Wilson first said that he did not know how Amy's injuries had occurred.  Forty-two minutes into the interview, Detective Woodside told Wilson that he was going to be charged with an offense.  Wilson then said that he had accidentally inserted his finger into Amy's vagina because she almost fell from his arms while he was checking her diaper.  He said that he had inserted his finger into her diaper to see if she was dirty; she began to fall; and when he grabbed to catch her, his finger had entered her vagina.  The detectives stepped outside of the room and returned several minutes later.  Detective Woodside then told Wilson that Amy's medical records showed that her injury could not have been caused accidentally.  He told Wilson that "no jury would believe" it was an accident.  Detective Woodside urged Wilson to "man up and tell . . . the truth."  One hour and ten minutes into the interview, Wilson admitted that he had inserted his finger into Amy's vagina intentionally out of curiosity.  Wilson became emotional and said that he was not a pervert.  Detective Woodside told Wilson not to go around Amy and not to go over to Natalie's house; Wilson said he

3

would not. Detective Woodside then left the room to "check with his sergeant," and when he returned, he arrested Wilson.[2]

Wilson filed a motion to suppress, alleging that his statements were taken in violation of the United States and Texas constitutions and Texas Code of Criminal Procedure article 38.22. After a hearing on his motion, the trial court denied it, finding that the interview became custodial when the detective placed Wilson under arrest approximately one hour and forty-three minutes after the interview began.[3] The State agreed to stop the videotape just prior to that— when Detective Woodside left the room to talk to his sergeant.

### III. STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v.*

---

[2]Detective Woodside testified that he had not intended to arrest Wilson that day but that due to Wilson's emotional state and after speaking with his sergeant and the district attorney's office, he arrested Wilson out of fear for the safety of Wilson, Amy, and Natalie.

[3]The trial court stated on the record that Wilson was told he was free to leave; that there was no indication that Wilson could not leave; that it appeared from watching the videotape that Wilson thought he was going to be arrested the following day; and that probable cause, "if not existing prior to the interview, certainly developed" at some point after the detective told Wilson that he would be charged.

4

*State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact

5

findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

## IV. CUSTODIAL INTERROGATION

The State may not use a defendant's statements stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). Article 38.22 of the code of criminal procedure also precludes the use of statements that result from a custodial interrogation without compliance with its procedural safeguards. *See* Tex. Code Crim. Proc. Ann. art. 38.22 (West Supp. 2014). Before an investigation reaches the accusatorial or custodial stage, a person's Fifth Amendment rights have not come into play, and the voluntariness in waiving those rights is not implicated. *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990).

Custodial interrogation is questioning by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). To determine whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526,

6

1529 (1994); *Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011). A person is in custody only if, under the circumstances, an objectively reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).

There are at least four general situations where a suspect's detention may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement creates a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id.* at 255; *McCulley v. State*, 352 S.W.3d 107, 115–16 (Tex. App.—Fort Worth 2011, pet. ref'd). In the first three situations, the restriction on freedom of movement must amount to a degree associated with arrest rather than investigative detention. *Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116.

Here, Wilson does not dispute that the interview began as a voluntary interview, not a custodial interrogation. Neither being the focus of a criminal investigation nor being questioned at a police station, without more, made the interview a custodial interrogation. *See Oregon v. Mathiason*, 429 U.S. 492, 495–96, 97 S. Ct. 711, 714 (1977); *Martinez v. State*, 131 S.W.3d 22, 33 (Tex. App.—San Antonio 2003, no pet.); *see also Dancy v. State*, 728 S.W.2d 772,

7

778–79 (Tex. Crim. App.) (explaining that when circumstances show that person acted only upon request or even urging of law enforcement and without threat that he will be taken forcibly, such person is not in custody), *cert. denied*, 484 U.S. 975 (1987). Wilson was not searched upon his arrival at the police station. Detective Woodside told Wilson that he "just wanted to talk to him about the case, what he knew, the timeline of events, and . . . made sure he understood he was not under arrest and he was free to leave at any time." Wilson said that he understood. Although, as Wilson points out on appeal, the interview was conducted in a room with no windows, with the door shut, and in close quarters to two police officers, these circumstances do not rise to the degree associated with a formal arrest. *See Dowthitt*, 931 S.W.2d at 255; *McCulley*, 352 S.W.3d at 116; *see also Long v. State*, No. 05-05-01634-CR, 2006 WL 3218559, at *2, *6 (Tex. App.—Dallas Nov. 8, 2006, pet. ref'd) (not designated for publication) (finding no custodial interrogation when appellant interviewed in room with one door and no windows). Wilson was not handcuffed during the interview, and he was not denied food, water, or the use of facilities. The door was not locked, and he was left alone in the room for several minutes at one point. Approximately fifty-one minutes into the interview, the detectives asked Wilson if he wanted any water before they stepped out of the room briefly. Wilson said that he did, and Detective Eubanks returned within a minute with a cup of water. Wilson's phone rang twice during the interview, and he was free to answer it, although he chose not to.

Wilson argues that the interview became custodial when Detective Woodside told him approximately forty-two minutes into the interview, "You're going to get charged with it; there's no doubt about that." Wilson argues that a reasonable person would think that he was under arrest at that point. Prior to this point in the video, Wilson agreed with Detective Woodside that one of the two males in the house—Wilson or Natalie's mother's boyfriend—had to have been the perpetrator of the crime and that the facts pointed to Wilson because he was holding Amy when she screamed and because no one had heard her scream or had seen blood in her diaper before that point. Detective Woodside informed Wilson that the videotape of the interview would be shown in court and that "if this goes to trial, and this goes in front of a jury, a jury's gonna hang [him]." The detective then made the statement at issue—that Wilson would be charged with the offense. A review of the entirety of the videotape up until this point demonstrates that the detectives never suggested, verbally or otherwise, that Wilson was under arrest or even that he was going to be arrested that day. Instead, the detectives suggested that they were still building their case against Wilson. The trial court stated on the record at the suppression hearing that Detective Woodside's statement was "a reference to a future action" and that the tone of the interview was no different after he told Wilson that he would be charged than before. The videotape, when viewed in the light most favorable to the trial court's ruling, supports the trial court's findings. *See Kelly*, 204 S.W.3d at 818–19; *Dowthitt*, 931 S.W.2d at 255; *see also Estrada*, 313 S.W.3d at 292,

294 (holding defendant was not subject to custodial interrogation when detective accused defendant of killing victim during interview); *Houston v. State*, 185 S.W.3d 917, 921 (Tex. App.—Austin 2006, pet. ref'd) (holding defendant was not in custody during interview in which officer "conveyed the strength of the State's case" to the defendant and told him not to commit any more robberies).

Wilson also asserts that the detectives had probable cause to arrest him after he admitted that he had accidentally penetrated Amy's female sexual organ. According to Wilson, his admission to penetrating Amy's vagina, albeit accidentally, coupled with the medical records showing that it was not an accident, established probable cause to arrest him and converted the interview into a custodial interrogation. But probable cause alone does not automatically establish custody; other circumstances must also combine to lead a reasonable person to believe that he is not free to leave and is under arrest. *See Dowthitt*, 931 S.W.2d at 255. Assuming probable cause existed at this point, the detectives never suggested to Wilson, verbally or otherwise, that he was not free to leave. *See id.* (stating that the fourth situation constituting custody requires probable cause to arrest and officers not telling the suspect he is free to leave). To the contrary, the detectives began the interview by telling Wilson that he was free to leave at any time, that he was not under arrest, and that they just wanted to talk with him about what he knew. As the interview progressed, Detective Woodside told Wilson several times that he thought Wilson did it, and Detective Woodside talked about what a jury would believe based on what Wilson had said

and the facts of the case. But at no point did either detective suggest that Wilson would be arrested that day or that their earlier statement that Wilson was free to leave at any time was no longer true. In fact, Wilson later said, "I leave here now, and I tell this story that yeah, I did this, [people who know me will say,] 'No, you wouldn't.'" Wilson lamented that he had to tell Natasha what he did, and Detective Woodside responded, "I'm just going to ask you not to go over there." The detective also told him not to go around Amy, and Wilson said that he would not do either.

A review of the entire videotape shows that Wilson himself thought he would be free to leave after the interview that day. *See Estrada*, 313 S.W.3d at 295 (noting that appellant stated several times during five-hour interview that he wanted to go home and citing *State v. Carroll*, 645 A.2d 82, 88 (N.H. 1994), for proposition that "defendant's statement that he 'want[ed] to go home' suggests 'that the defendant himself believed that he could have left if he so chose'"). Although a reasonable person would have realized the incriminating nature of the admission, no other factors indicating police control over Wilson existed to lead a reasonable person to believe that he was under arrest. *Compare Dowthitt*, 931 S.W.2d at 254–55, 57 (holding "custody" began when Dowthitt admitted to his presence during murders because "a reasonable person would have realized the incriminating nature of the admission," and other factors were present that "involv[ed] the exercise of police control" over him—the lengthy interrogation lasting over twelve hours, officers accompanying him to restroom, and officers

ignoring his requests to see his wife), *with Hodson v. State*, 350 S.W.3d 169, 174–75 (Tex. App.—San Antonio 2011, pet. ref'd) (holding defendant not in custody during sixty-minute interview during which defendant admitted involvement in murder and noting that situations where the manifestation of probable cause triggers custody are unusual), *Houston*, 185 S.W.3d at 921 (explaining that "[a]lthough there was probable cause to arrest and the strength of the State's case was readily apparent to all," detectives specifically told defendant that he was not under arrest and implied through their questioning that he could leave), *and Scott v. State*, 165 S.W.3d 27, 42 (Tex. App.—Austin 2005) ("Although probable cause to arrest arose early in the questioning, the officers never suggested by word or deed that Scott was not free to leave."), *rev'd on other grounds*, 227 S.W.3d 670 (Tex. Crim. App. 2007).

The record as a whole does not clearly establish that Wilson was in custody until the detectives told Wilson that he was under arrest approximately one hour and forty-three minutes into the interview; thus, we hold that the trial court did not err by not suppressing the videotape prior to this point. *See Herrera*, 241 S.W.3d at 526. We overrule Wilson's sole issue.

## V. CONCLUSION

Having overruled Wilson's sole issue, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and GABRIEL, JJ.

MEIER, J. filed a concurring opinion.

PUBLISH

DELIVERED:  August 14, 2014