

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00494-CR

RODNEY CHASE PETTIGREW                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

### FROM THE 415TH DISTRICT COURT OF PARKER COUNTY
### TRIAL COURT NO. CR11-0767

----------

## MEMORANDUM OPINION[1]

----------

A jury found Appellant Rodney Chase Pettigrew guilty of capital murder, and the trial court sentenced him to life in prison. Appellant was convicted for killing fourteen-month-old K.B. Appellant brings seven points of error: (1) the trial court abused its discretion by admitting irrelevant extraneous offenses; (2) assuming the extraneous offenses were relevant, the trial court nevertheless

---

[1]*See* Tex. R. App. P. 47.4.

abused its discretion by admitting them because their probative value was substantially outweighed by the danger of unfair prejudice; (3) the trial court abused its discretion by admitting the portion of Appellant's interview that followed his request for counsel; (4) the trial court abused its discretion by admitting hearsay consisting of medical statements by unnamed declarants; (5) the trial court violated Appellant's right to confrontation by allowing testimony that an affidavit by a CARE Team member supported the theory that a crime had been committed; (6) in conjunction with the same testimony that an affidavit by a CARE Team member supported the theory that a crime had been committed, the trial court abused its discretion by admitting hearsay; and (7) the trial court abused its discretion by admitting hearsay that members of K.B.'s grandmother's church confirmed K.B.'s grandmother's belief that one of K.B.'s injuries was caused by a flat iron. We affirm.

## EVIDENCE

Appellant called 911 on the morning of September 15, 2011, with a medical emergency. Appellant reported that K.B., whom he had been watching, had stopped breathing.[2]

A paramedic who responded to the call testified that K.B. had no pulse at first, so he began life-saving procedures. When feeling the back of K.B.'s head, the paramedic was concerned because he could feel that the bones were not

---

[2]Appellant was not the father of K.B. Appellant and K.B.'s mother were in a relationship in September 2011.

2

stable. He explained that K.B. had a crepitus, which he described as bone rubbing against bone. He elaborated, "That indicates there's a fracture. And there wasn't just one, there was a few bones moving." K.B. also had a bruise six to eight centimeters long on the right side of his upper forehead.

Officer Michael Ingram also responded to the call. Appellant told him that K.B. had fallen off a countertop and hit his head on the floor and had become unresponsive.

K.B.'s mother knew of Appellant because they went to the same high school. Sometime in 2011, they started messaging each other on Facebook. Soon thereafter they started dating.

K.B.'s mother testified that on September 15, 2011, because she was working only four hours that day, she left Appellant to watch K.B. rather than take K.B. to daycare while she was at work. Later that morning, Appellant told her that K.B. "had an accident," had fallen off the counter, and had been taken to the hospital in Azle. She left work without telling her manager and went straight to the hospital in Azle. She rode with K.B. in the ambulance when he was transferred to Cook Children's Medical Center in Fort Worth. Once there, she sat in a waiting room until she spoke with someone from law enforcement. She also spoke with medical staff, as shown by the following,

> [Prosecutor:] Did you also at some point have a chance to talk to the medical staff?
>
> A. Yes, ma'am.

3

Q. Okay. How'd that conversation go?

A. They let me know it wasn't an accident.

Q. I'm sorry?

A. They let me know that it wasn't an accident.

On September 16, 2011, a doctor informed K.B.'s mother that it did not look like K.B. "was going to make it" and asked her if she wanted to donate his organs. When asked how she responded, she answered, "I made the decision to donate his organs."

When shown a photograph of a burn mark on K.B.'s leg, K.B.'s mother said that Appellant had told her it was from the seat belt of the car seat. When first shown the burn mark, she thought that K.B. might have gotten it from a flat iron, but she was confused because she did not keep her flat iron anywhere where K.B. could get to it and because she did not recall K.B. burning himself in her presence. K.B.'s mother said that at the time Appellant told her that the burn was from the buckle on the car seat being too hot, she had no reason not to believe him.

When shown a photograph showing a mark on K.B.'s right upper forehead, K.B.'s mother said she did not notice it when she left for work that morning. She said that she had the normal mommy routine of saying good-bye when leaving K.B. and that she would have noticed it.

K.B.'s mother spoke with the investigator at the hospital about how Appellant was with K.B. She told the investigator that Appellant was good with

4

K.B. and that she did not think Appellant would hurt K.B. in any way. K.B.'s mother said she would not have left K.B. in Appellant's care if she had thought there was an issue. She had not seen any injuries to K.B.'s ears.

Dr. Keegan Miller, the emergency physician at Texas Health Resources in Azle who treated K.B., testified that K.B. had no pulse, had an abrasion to his head, and had a hematoma to the back of his head. Dr. Miller estimated that K.B. had been nonresponsive for forty to fifty minutes before arriving at the hospital. Dr. Miller testified that K.B. was transferred to Cook Children's Medical Center with a report that he had suffered a severe skull fracture from a reported fall from a countertop. Twenty minutes after his arrival at the hospital, Dr. Miller managed to resuscitate K.B.'s pulse. Dr. Miller testified that it was unlikely, but not impossible, that K.B.'s injuries were caused by a fall from a countertop. Dr. Miller testified that he usually associated injuries like K.B.'s with some sort of abuse or nonaccidental trauma. Dr. Miller elaborated, "Usually they are either from shaking or from some sort of, you know, assault almost, you know; being hit with a hammer, I've seen an injury like that with that, those type of things." He testified that if the head hit the right object, a fall from just about any level could cause a skull fracture. He added, however, "[I]t's highly unlikely that this particular fracture and displacement of the fragment as far as it was was caused by a—a fall off of a countertop." He could not say whether K.B.'s injuries were from shaken baby syndrome.

5

Dr. Kristi Kuenstler testified that she was a practicing radiologist and head of the radiology department at Texas Health Resources in Azle. K.B. was one of her patients on September 15, 2011. She did some CT scans on K.B. She testified that she could look at the images as the patient was being scanned, so she had immediate answers. She testified,

> [T]his patient had a very severe skull fracture, probably one of the most severe skull fractures I've seen in 20 years of practicing. He had, actually, a piece of his—the back part of his skull, the occipital bone, which was about 1.8 centimeters in size, which was not only broken, but pushed in and moved over by a centimeter and a half, which is extremely rare to see that.
>
> And then he had also other linear fractures that extended up higher into his head. He had fractures that were what we call comminuted, which means any fracture that has more than three parts to it is a comminuted fracture, it's not a simple fracture. This fracture would be categorized as comminuted or almost a shattered appearance at the back of the head where he had multiple fracture fragments. And then the fracture continued down into what we call the temporal bone, which is at the base of the skull . . . .

She added,

> This is extremely bad. And on top of that, the skull fracture alone isn't going to kill you; we get people with skull fractures every day. What kills you is the brain injury underneath it. And this child had extremely severe cerebral edema. And what cerebral edema is is where your brain has literally swollen to the point where it has outreached the capacity of the skull.

Dr. Kuenstler continued,

> [I]n infants or young children what typically happens is they just stop breathing and they stop having a heartbeat and this overwhelming trauma causes this cascade of events where the blood flow to the brain becomes completely cut off. In other words, there's so much swelling that the blood from the carotid arteries can't get there and you've lost blood supply to the brain, and then the brain starts to die.

6

Your brain starts to die very quickly, actually. You only have six minutes before your brain is irreversibly damaged.

She commented,

I don't believe I've ever seen a fracture like this in a child or in an adult that wasn't caused by something like a gunshot wound or a hammer or something very focal hitting a—a very focal spot. Because when you hit a solid structure like the ground, that force is transmitted out and you may actually even have a little star-like fracture where you can almost imagine like a winter—a window splintering but not to take a piece of bone and shove it in and move it over.

K.B. also had a splenic rupture or cut that was not likely the result of CPR. K.B. had no rib fractures either, which could also result from CPR. Dr. Kuenstler testified that K.B. had a hemorrhage between the two hemispheres of the brain, which she said was highly suggestive of nonaccidental injury. Dr. Kuenstler testified that the injuries were considered to be high-impact, high-velocity injuries.

She explained,

In other words, there are low impact, low velocity things, such as falling over and hitting your head. There are high impact injuries such as gunshot wounds, high speed car accidents, falls from a very significant height, several stories high, or a severe blow to the head, and that means something with a much higher velocity than just a short fall.

In her opinion, this was an extremely severe case. She testified that this type of injury was "[a]bsolutely not" consistent with a short fall off a kitchen counter. She explained,

In my experience, as well as in the literature, and this is highly supported in the literature, that the vast majority of—of accidental skull fractures are in the parietal bone, which is kind of this bone right here on the side of your head. And you can imagine that

7

people tend to fall on the side of their head. They're trying to get away from the fall. It is very unusual, actually, to fracture the back of your head.

So that is another one of those checklist things that we look for is that nonparietal fractures, and most specifically that they mention occipital bone fractures, are much more suggestive of nonaccidental trauma.

She said, "[B]asically this child had the entire laundry list of things that we look for in nonaccidental trauma."

Dr. Eric Packwood, a pediatric ophthalmologist, observed blood in K.B.'s retina. He associated retinal hemorrhaging with shaken baby syndrome. He added that there were different ways that someone could have a retinal hemorrhage.

Dr. Gary Sisler performed the autopsy on K.B. K.B. had a one-inch-by-one-inch contusion on the right forehead that did not play a role in his death. He found a complex fracture of the occipital bone with displacement of an occipital fragment into the right parietal bone and right posterior fossa. The displaced fracture could also be considered a depressed fracture, meaning that the fracture was pushed below the surface of the skull. Dr. Sisler testified that, with enough force, the injury could come from a completely flat surface, but this injury indicated a localized impact, which suggested an uneven surface. He determined that the cause of death was traumatic head injury and that the manner of death was homicide. Dr. Sisler did not rule out the possibility that K.B. fell from a counter to a hard surface.

8

**POINTS ONE AND TWO**

**Whether the trial court erred by admitting the daycare workers' observations and concerns regarding possible extraneous offenses.**

Appellant's first two points complain about the admission of State's Exhibit 54, which consisted of email correspondence between employees of Safe Harbor Christian Learner Center describing their concerns that K.B. was being abused and the admission of the testimony of the daycare employees to the same effect. In his first point, he argues that the extraneous offense allegations were not relevant apart from character conformity. *See* Tex. R. Evid. 401, 402, 404(b)(1). Appellant asserts that the State was trying to show he had a character for violence and that he acted in conformity with that character at the time of the murder. In his second point, assuming the evidence was relevant, he argues that the minimal probative value of the extraneous offense allegations was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. App. P. 403.

State's Exhibit 54 contained emails exchanged at the daycare in which daycare employees expressed concerns that K.B. was being abused. The evidence consisted of a burn on K.B.'s leg, a bruise on K.B.'s forehead, bruising on his left ear, and bloody scabs on his right ear. K.B.'s equilibrium was off, and he could not keep his balance when standing. There was also evidence that when Appellant came to pick K.B. up, one witness described K.B. as crying

"violently" and clinging to a daycare worker and another witness described him as "screaming like he was fearing for his life."[3]

In the charge, the trial court instructed the jury that the admitted extraneous offenses could be considered only if the jury believed beyond a reasonable doubt that they had been committed and, even then, only for determining intent or knowledge or the absence of a mistake or an accident and could not be used for character conformity. Specifically, the instruction provided,

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the intent or knowledge of the defendant, or absence of mistake or accident, if any, in connection with the offense, if any, alleged against him in the indictment, and not to prove the character of the defendant or that he acted in conformity therewith.

The State relied on article 38.36(a) of the code of criminal procedure, which provides,

> (a) In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

---

[3] K.B.'s mother testified that when she picked him up from daycare, he was excited to see her and would reach up for her.

10

Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2005). Article 38.36(a) does not, however, trump the rules of evidence. The court of criminal appeals wrote,

> Because Article 38.36(a) and Rules 404(b) and 403 can be congruously applied as mandated by Rule 101(c), and because grafting an exception into Article 38.36(a) contravenes its plain language, this Court holds evidence admissible under Article 38.36(a) may be nevertheless excluded under Rule 404(b) or Rule 403. Consequently, if a defendant makes timely 404(b) or 403 objections, before a trial court can properly admit the evidence under Article 38.36(a), it must first find the non-character conformity purpose for which it is proffered is relevant to a material issue. If relevant to a material issue, the trial court must then determine whether the evidence should nevertheless be excluded because its probative value is substantially outweighed by the factors in Rule 403.

*Smith v. State*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999) (footnote omitted).

Appellate courts review a trial court's admission of evidence for an abuse of discretion. *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet ref'd). We will uphold the trial court's ruling so long as it falls within the "zone of reasonable disagreement" and is correct under any theory of law applicable to the case. *Id.* at 782.

The evidence showed that K.B. had injuries that the daycare employees suspected might have been the product of abuse. The evidence also showed that K.B. feared Appellant. Appellant does not complain about K.B.'s fear of him being admissible to show "the previous relationship existing between the accused and the deceased." *See* Tex. Code Crim. Proc. Ann. art. 38.36.

To the extent the evidence suggested extraneous offenses, the jury instruction protected Appellant. Juries are "presumed to follow the trial court's

11

instructions in the manner presented." *Kirk v. State*, 199 S.W.3d 467, 479 (Tex. App.—Fort Worth 2006, pet. ref'd). The jury was prohibited from using the extraneous bad conduct to convict Appellant if they did not believe, beyond a reasonable doubt, that Appellant engaged in the conduct, and even if the jury believed he engaged in the conduct, it was prohibited from convicting Appellant for being a violent person generally. The jury was allowed, however, to use this other evidence of suspicious injuries, coupled with K.B.'s pronounced fear of Appellant, to shed light on whether K.B.'s subsequent death while in Appellant's care occurred in the "absence of mistake or accident." *See* Tex. R. Evid. 404(b)(2). K.B.'s death did not occur in a vacuum. It occurred in the context of K.B.'s having other injuries shortly before his death and of K.B.'s displaying pronounced fear when being picked up by Appellant. The evidence did not show that Appellant was violent generally, and the instruction prohibited the jury from convicting Appellant on the theory that he was violent generally. The trial court was within its discretion to rule that its probative value was not substantially outweighed by a danger unfair prejudice. *See* Tex. R. Evid. 403; *Kirk*, 421 S.W.3d at 781 (stating that standard of review is abuse of discretion).

We overrule Appellant's first two points.

## POINT THREE

**Whether the trial court erred by admitting the portion of Appellant's interview after he invoked his right to counsel.**

In his third point, Appellant contends that the trial court abused its discretion by admitting the portion of Appellant's interview after Appellant invoked his right to counsel. We disagree.

The United States Constitution commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Constitutional and statutory protections are triggered when a person undergoes custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *Herrera v. State*, 241 S.W.3d 520, 525–26 (Tex. Crim. App. 2007); Tex. Code Crim. Proc. Ann. art. 38.22 (West Supp. 2016). "Custodial interrogation" is the "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; *Herrera*, 241 S.W.3d at 525. Article 38.22 of the code of criminal procedure also prohibits the use of statements that result from a custodial interrogation without compliance with its procedural safeguards. *See* Tex. Code Crim. Proc. Ann. art. 38.22.

Custodial interrogation occurs when law enforcement officers question a person after taking him into custody or depriving him of his freedom of action in any significant way. *Wilson v. State*, 442 S.W.3d 779, 784 (Tex. App.—Fort

13

Worth 2014, pet. ref'd), *cert. denied*, 136 S. Ct. 86 (2015). A court must examine all of the circumstances surrounding the interrogation when determining whether someone is in custody; however, the ultimate inquiry is simply whether there was a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1529 (1994); *Estrada v. State*, 313 S.W.3d 274, 294 (Tex. Crim. App. 2010), *cert. denied*, 562 U.S. 1142 (2011); *Dowthitt v. State*, 931 S.W.2d 244, 254–55 (Tex. Crim. App. 1996).

The court of criminal appeals identified four scenarios wherein a person might be deemed in custody: (1) when the person is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the person he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the person he is free to leave. *Dowthitt*, 931 S.W.2d at 255. Regarding the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* Regarding the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect. *Id.* Such manifestation could occur if the officers relate information substantiating probable cause to the person or, conversely, if the person relates information substantiating probable cause to the officers. *Id.* Moreover, given the emphasis

14

on probable cause as a factor in other cases, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

A determination of whether a person is in custody must be based entirely on objective circumstances. *Id.* at 254. The subjective intent of either law enforcement or the defendant is irrelevant except to the extent manifested in the words or actions of law enforcement officials. *Id.* Finally, a defendant bears the initial burden of proving that his statement was the product of "custodial interrogation." *Herrera*, 241 S.W.3d at 526.

Ranger Danny Briley testified that he asked Appellant to talk to him further about what had happened and that Appellant agreed to meet with him at the Azle Police Department. Ranger Briley explained that the Azle Police Department had an audio/video room, which he wanted in conjunction with the investigation. Ranger Briley denied making any threats and denied pressuring Appellant. Ranger Briley stated that Appellant was not under arrest. Investigator Sammy Slatten took Appellant to the Azle Police Department, and Ranger Briley followed because he did not know where the police department was. Ranger Briley testified that Appellant got in the front of Investigator Slatten's pickup and that Appellant was not handcuffed or restrained in any way. Ranger Briley denied that Appellant was under arrest at any time during the interview and stated that

15

Appellant was free to leave at any time. The interview lasted about three hours. During that time, Ranger Briley did not deny any break, food, or drink that Appellant requested. At no point did Ranger Briley or Investigator Slatten promise or give Appellant anything for his answers. Appellant was allowed to keep his cell phone during the entire interview. The interview was divided onto two disks, one before a break, and the other after a break. During the interview after the break, Appellant asked, "Do I need a lawyer right now?" Ranger Briley did not respond to Appellant's question, and the interview continued. It is this latter portion, which was played to the jury, about which Appellant complains.

During a second break, Appellant received a text message that his father was being airlifted to El Paso, and Appellant became very emotional and distraught. Appellant's father had been riding a motorcycle and had had an accident. Ranger Briley assumed that because Appellant's father was being airlifted, it was serious. Ranger Briley stated, "We decided that we would allow him to—to leave. We felt that was best based upon the—the situation that—that he had. Although we could arrest him, we felt that we could gather more from him later. He agreed to cooperate with us the—the next day." Ranger Briley said that Appellant did not have a car, so Investigator Slatten took him back to his residence. Ranger Briley testified that his and Investigator Slatten's plan was to continue the interview the next day.

The next day, however, Appellant did not answer his phone, so Ranger Briley tried to find him. Appellant's friends were not cooperative. Ranger Briley

16

learned that K.B. had been pronounced dead and that there was a warrant for Appellant for the offense of capital murder, so the plan then became to locate and arrest Appellant.

We hold that the trial court did not abuse its discretion by finding that Appellant was never taken into custody and was not deprived of his freedom of action in any significant way. *See Wilson*, 442 S.W.3d at 784. Early in the interview, Ranger Briley and Investigator Slatten make it clear to Appellant that, based upon the information they were getting from the hospital, they did not believe Appellant's story that K.B. fell off the counter. From start to finish, however, Appellant never varied from his assertion that K.B.'s injuries were caused by a fall from the counter. When Investigator Slatten inquired whether Appellant had injured K.B. accidentally in some other way, Appellant insisted the injuries were caused by a fall from the counter. As Ranger Briley effectively conceded during his testimony, he could have arrested Appellant if he had wanted to, but he did not, and when Appellant received the text message that his father had been injured, Appellant left with the assistance of the officers. Notwithstanding the officers' manifestation that they did not believe Appellant's explanation for K.B.'s injuries, no reasonable person would believe that Appellant was under restraint to the degree associated with an arrest when he left the interview and went home with the assistance of the police. *See Dowthitt*, 931 S.W.2d at 255. The officers' inability to locate Appellant the next day suggests that they did not even have Appellant under surveillance. Under the

17

circumstances, the trial court could have reasonably concluded that an objectively reasonable person would not have believed that his freedom of movement was restrained to the degree associated with a formal arrest. *See Wilson*, 442 S.W.3d at 781–87 (holding that voluntary interview did not become custodial when detective asserted defendant would be charged with an offense or when defendant admitted accidental penetration of a child's sexual organ; holding custody occurred when detective told the defendant he was under arrest); *Hodson v. State*, 350 S.W.3d 169, 174–75 (Tex. App.—San Antonio 2011, pet. ref'd) (holding defendant was not in custody during sixty-minute interview when he admitted involvement in murder and noting that situations where the manifestation of probable cause triggers custody are unusual); *Houston v. State*, 185 S.W.3d 917, 921 (Tex. App.—Austin 2006, pet. ref'd) (explaining that although "there was probable cause to arrest and the strength of the State's case was readily apparent to all," detectives specifically told defendant that he was not under arrest and implied though their questioning that he could leave); *Scott v. State*, 165 S.W.3d 27, 42 (Tex. App.—Austin 2005) ("Although probable cause to arrest arose early in the questioning, the officers never suggested by word or deed that [the defendant] was not free to leave."), *rev'd on other grounds*, 227 S.W.3d 670 (Tex. Crim. App. 2007).

Regarding any request for counsel, the law is well settled that we must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason

for its ruling.  *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).  Because the record may be understood in a manner to support the trial court's rulings, we are compelled to hold that Appellant was not in custody and, therefore, not subjected to custodial interrogation.  Because the record reflects Appellant was free to leave and, in fact, left freely, even if he had unambiguously requested counsel, Ranger Briley and Investigator Slatten were free to ignore any request.  *See State v. Howard*, 378 S.W.3d 535, 540–41 (Tex. App.—Fort Worth 2012, pet. ref'd).

We overrule Appellant's third point.

## POINT FOUR

**Whether the trial court abused its discretion by admitting hearsay consisting of medical statements by unnamed declarants.**

In his fourth point, Appellant asserts that the trial court abused its discretion by admitting hearsay evidence regarding unnamed declarants' medical statements.  During the State's direct examination of Ranger Briley, the State asked him if the medical representations that he and Investigator Slatten made to Appellant regarding K.B.'s condition were true, and over Appellant's objection, Ranger Briley testified that the medical representations were true because "the medical statements that we were receiving [were] that it was not . . . accidental." Specifically, the following occurred,

19

[Prosecutor:] Are there times, Ranger Briley, that with respect to the interview of a defendant, whether in custody or out of custody, that you might say things which are not necessarily true?

[Ranger Briley:] Yes.

[Prosecutor:] With respect to the medical representations that you made on September 15th, 2011, in State's Exhibits Nos. 31 and 32, do you believe those to be true and accurate representations of [K.B.'s] medical condition?

[Ranger Briley:] The statements made on video?

[Prosecutor:] Yes, sir.

[Ranger Briley:] Yes. Yes, except for the times when it was referred as accidental. I think sometimes we referred to the incident as being accidental and, obviously, the medical statements that we were receiving was that it was not –

[Defense Counsel:] Object to hearsay—

[Ranger Briley:] —accidental.

[Defense Counsel:] —Your Honor, medical statements receiving.

THE COURT: Overruled.

The State argues that Appellant's objection was not timely because Ranger Briley had already answered the question before Appellant objected. We disagree. Defense counsel did not object to what Ranger Briley believed to be true; rather, defense counsel objected to what the medical statements were telling Ranger Briley. That objection was timely. *See* Tex. R. App. P. 33.1. On appeal, Appellant is making the same complaint. Assuming, without deciding, that the trial court erred, we hold that any error was harmless. Other medical evidence came in without objection that indicated K.B.'s injuries were intentional,

20

not accidental.  Additionally, K.B.'s mother testified that the medical staff told her that the injuries were not accidental.  Any error in the admission of evidence is harmless if it is cumulative of evidence admitted elsewhere without any objection. *See Stewart v. State*, 221 S.W.3d 306, 313 (Tex. App.—Fort Worth 2007, no pet.).  We hold that the trial court did not abuse its discretion by admitting this evidence.  *See Kirk*, 421 S.W.3d at 781 (stating that standard of review is abuse of discretion).

We overrule Appellant's fourth point.

**POINTS FIVE AND SIX**

**Whether the trial court violated Appellant's right to confrontation by allowing testimony that an affidavit by a CARE Team member supported the theory that a crime had been committed, and whether, in conjunction with the same testimony, the trial court abused its discretion by admitting hearsay.**

In Appellant's fifth point, he maintains that the trial court violated his right to confrontation by allowing testimony that an affidavit by a member of the CARE Team supported the theory that a crime had been committed.  In his sixth point, regarding the same affidavit, he contends that the trial court abused its discretion by admitting hearsay supporting the theory that a crime had been committed.

Specifically, Sergeant Ricky Montgomery was an investigator and operations sergeant with the Parker County Sheriff's Office who assisted with the investigation.  Sergeant Montgomery testified as follows,

> [Prosecutor:] At some point in time when all this is going on, was an affidavit provided to you from a member of the CARE Team?

21

[Sergeant Montgomery:] Yes, it was.

[Prosecutor:] With respect—did you relay the information in that affidavit to Investigator Sammy Slatten?

[Sergeant Montgomery:] Yes, I did.

[Prosecutor:] And again without going into specific details, the information in that affidavit, do you believe it supported or did not support the fact that a crime had been committed on [K.B.]?

[Defense counsel:] Judge, that's kind of a backdoor hearsay and confrontation clause. I'm going to object on both of those bases to—not saying what's in the affidavit, it—it supports some proposition which would require an understanding of the content.

THE COURT: Statement's not offered. Hearsay objection's overruled.

The question is, do you believe it supported or did not support the fact that a crime had been committed on [K.B.]

You may answer.

[Sergeant Montgomery:] I believe it supported.

[Prosecutor:] Do you recall what, if anything else, you did on September 15th, 2011, on this case? Anything else of significance that pops to your mind right now?

[Sergeant Montgomery:] Not—not off the top of my head, no, sir.

Assuming, without deciding, that the trial court erred, we hold that any error was harmless. The other evidence showed that the doctors who initially saw K.B. in Azle thought his injuries were not accidental. Additionally, K.B.'s mother testified that the medical staff at Cook Children's Medical Center in Fort Worth told her that the injuries were not accidental. Furthermore, Dr. Jayme

22

Coffman, the medical director of the CARE Team at Children's Medical Center in Fort Worth, testified at trial.

Dr. Coffman testified that a nurse practitioner initially saw K.B. around 5:00 p.m. on September 15, 2011, and performed an assessment that night. When Dr. Coffman came in on September 16, 2011, she performed her own assessment. She reviewed the case with the nurse practitioner and then saw K.B. personally. What she observed was what she expected based upon her review of the records before viewing him. When asked if K.B.'s injuries were consistent with the history given by Appellant, she responded,

> There's no way. There—it was a one-inch chunk of bone on the back of his head that had been shoved over to the left. There's no way an impact onto a flat surface from that height could cause that bone to shift to the side. It was a very complex skull fracture. It crossed what we call suture lines where—the growth plates for the baby. So it not only—you had a one-inch chunk of bone shoved to the side, not just in, but over to the side. It goes up and crosses over a suture line, then goes down to the base of the skull all the way to the hole where your spinal cord goes through. That's a thick part of the bone and then extended forward into the base of the skull. So crossing all those parameters and a chunk of bone shifted over, there's no way that could happen from a fall on a flat surface.

Based on Dr. Coffman's research, she estimated that "the actual incidents of death from a short fall for children is .48 out of a million." On cross-examination, she acknowledged that she was not saying that a child could not die from a short fall. Finally, any error in the admission of evidence is harmless if it is cumulative of evidence admitted elsewhere without any objection. *See Stewart*, 221 S.W.3d at 313.

23

We overrule Appellant's sixth point.

Assuming, without deciding, that Appellant's right to confrontation was violated, for the same reasons, we hold that the error, if any, was harmless beyond a reasonable doubt. *See* Tex. R. App. P. 44.2(a); *Sanders v. State*, 422 S.W.3d 809, 817–18 (Tex. App.—Fort Worth 2014, pet. ref'd) (concluding that any error in the admission of a statement in violation of the accused's right to confrontation was harmless in view of other uncontroverted, unobjected-to evidence that established the same facts); *see also Marlar v. State*, No. 02-15-00136-CR, No. 02-15-00137-CR, 2016 WL 853040, at *3 (Tex. App.—Fort Worth Mar. 3, 2016, no pet.) (mem. op., not designated for publication) (same).

We overrule Appellant's fifth point.

## POINT SEVEN

**Whether the trial court abused its discretion by admitting hearsay that members of K.B.'s grandmother's church confirmed K.B.'s grandmother's belief that one of K.B.'s injuries was caused by a flat iron.**

In his seventh point, Appellant argues that the trial court abused its discretion by admitting hearsay that third party declarants confirmed a witness's belief that one of K.B.'s injuries was caused by a flat iron. Specifically, Appellant complains about how "other people at [K.B.'s grandmother's] church," who saw K.B. shortly before his death, confirmed K.B.'s grandmother's belief that the burn on his leg was from a flat iron.

K.B.'s paternal grandmother testified as follows,

24

[Prosecutor:] When you saw that burn on little [K.B.'s] leg on the weekend of August 27th, what did it appear to you had made that type of injury, based on your 30 years in—in cosmetology?

[Grandmother:] It was a flat iron burn.

[Prosecutor:] And, in fact, did other people at your church that saw [K.B.] that weekend confirm your belief?

[Grandmother:] Yeah.

[Prosecutor:] And—and that's—that's—

[Defense counsel:] Excuse me.

[Grandmother:] Oh.

[Defense counsel:] I'm going to object to the confirmation of third parties as hearsay, Your Honor.

THE COURT: Overruled.

[Prosecutor:] It was a yes-or-no question. Did other people confirm your belief?

[Grandmother:] Yes.

Assuming, without deciding, that Appellant preserved error and that the trial court erred by overruling Appellant's objection, we would still have to determine whether any error called for a reversal. *See Hall v. State*, No. 02-14-000371-CR, 2015 WL 5025173, at *1 (Tex. App.—Fort Worth Aug. 25, 2015, no pet.) (mem. op., not designated for publication). "The admission of inadmissible hearsay constitutes nonconstitutional error, and it will be considered harmless if the appellate court, after examining the record as a whole, is reasonably assured that the error did not influence the jury verdict or had but a slight effect." *Broderick v. State*, 35 S.W.3d 67, 74 (Tex. App.—Texarkana 2000, pet. ref'd)

25

(citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). Furthermore, the improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. *Hall*, 2015 WL 5025173, at *1.

K.B.'s mother had already testified that when she first saw the burn mark on K.B.'s leg, she thought it might have been caused by a flat iron. However, she dismissed the idea because K.B. did not have access to her flat iron, because she did not otherwise remember K.B. burning himself in her presence, and because Appellant told her K.B. got the burn from the seat belt of his car seat. K.B.'s mother said that Appellant had told her it was from the seat belt of the car seat. K.B.'s grandmother, with thirty years' experience in cosmetology, also asserted the mark was a flat iron burn. Because the same evidence came in through K.B.'s mother and K.B.'s grandmother without objection, we hold that any error in admitting the disputed statement did not influence the jury or had but a slight effect and was, therefore, harmless. *See id.*; *Broderick*, 35 S.W.3d at 74.

We overrule Appellant's seventh point.

## CONCLUSION

Having overruled all of Appellant's points, we affirm the trial court's judgment.

26

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  DAUPHINOT and GARDNER, JJ; and CHARLES BLEIL (Senior Justice, Retired, Sitting by Assignment).

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  December 22, 2016