

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00073-CR

———————————————————

RICARDO LARA MARTINEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 362nd District Court
Denton County, Texas
Trial Court No. F17-1599-362

Before Kerr, Pittman, and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Ricardo Lara Martinez of murdering Juanita,[1] the mother of their child, and assessed his punishment at fifty years' confinement. The trial court sentenced Martinez accordingly. In two issues, Martinez contends that his conviction is not supported by sufficient evidence and that the trial court erroneously denied a self-defense instruction. We conclude that the evidence is sufficient to support Martinez's murder conviction and that Martinez was not entitled to a jury instruction on self-defense. Additionally, if the trial court's failure to instruct the jury on self-defense was error, we conclude the error was harmless. We affirm the trial court's judgment.

## II. BACKGROUND

Martinez and Juanita met in 2008, and in 2010, Juanita gave birth to their son, A.L. Their relationship ended when A.L. was three years' old, but Martinez had possession of A.L. as he desired, which was almost every weekend.

---

[1]We use aliases to refer to the decedent, her child, and select witnesses to protect the identities of minors. *See* Tex. R. App. P. 9.10(a)(3); *Daggett v. State*, 187 S.W.3d 444, 446 n.3 (Tex. Crim. App. 2005); *Wilson v. State*, 442 S.W.3d 779, 782 n.1 (Tex. App.—Fort Worth 2014, pet. ref'd).

By October 2014,[2] Juanita intended to seek sole custody of A.L. She filed a custody petition in which she expressed concern about the possible international abduction of A.L. and specifically sought to enjoin Martinez from removing A.L. from the United States to Mexico.

Toward the end of November, Martinez told friends that he and A.L. were going to Mexico because Martinez's father was sick. He also sold his personal belongings, including his green motorcycle, for which he had asked payment of "$3300 obo" and advertised, "NEED TO SELL ASAP."[3] As requested, Oscar Lopez[4] helped Martinez send $3,400 on December 7, 2014, and $3,500 on December 11, 2014, to Martinez's father in Mexico.

In October or November 2014, Juanita began dating Carlos Hernandez. By early December 2014, Juanita planned to move in with Carlos in January 2015 and was going to take A.L. to live there as well.

On Thursday, December 11, 2014, Martinez made arrangements with Oscar Rivera to transport him and A.L. to Mexico. Lopez recalled that Martinez spoke to Rivera about driving to Mexico a few weeks before he departed and initially

[2]Juanita initially filed suit in 2011.

[3]At trial, the Craigslist posting admitted in evidence had been printed on December 15, 2014, and contained a notation that the posting had been updated "16 days ago."

[4]We refer to Oscar Lopez and another witness, Oscar Rivera, by their last names for clarity.

3

understood that Martinez would be traveling alone. However, one or two days before departing for Mexico, Martinez told Lopez that Juanita had authorized him to take A.L. with him and said she would pick up and return A.L. to the United States after one week.

On that same Thursday evening, Carlos and Juanita were scheduled to attend an opera in Dallas, but Juanita continually changed their meeting location. When they finally met, Juanita cried and told Carlos that she was concerned that Martinez had been selling his personal items. Juanita also suggested that she and Carlos stop seeing each other, which surprised Carlos. However, on Friday, Juanita informed Carlos that she had signed the lease agreement, and they could live together.

Juanita worked for an insurance business in Denton, and Maria Morales was her coworker. Maria worked from 9:00 a.m. to 2:00 p.m., and Juanita worked from 2:00 p.m. to 6:00 p.m., but they did not see each other on Friday, December 12, 2014. Juanita had made two bank deposits for the company at 2:03 p.m. and printed the daily report at 5:56 p.m. Juanita did not reply to Maria's text message that was sent between 5:30 p.m. and 6:00 p.m. and failed to respond to Carlos's attempts to communicate with her, which was unusual and concerned him. Carlos knew that Juanita and A.L. were supposed to meet with Martinez on Friday evening, and he knew that Juanita feared Martinez.

Bobby Hare lives in a house directly across from the insurance company, and he sat on his front porch and drank two beers before 3:30 p.m. on Friday,

4

December 12, 2014. Bobby had previously met a Hispanic woman and her young son at the insurance company, and he observed the woman leave the insurance office at about 3:30 p.m., walk alone to a nearby taqueria, and return alone. The taqueria employee saw Juanita pick up food after 2:00 p.m. or 3:00 p.m. without her son.

Bobby never saw the woman after she returned to work that day. However, at about 5:30 p.m., he noticed that the woman's white car had been moved from the front of the business and was parked at a nearby laundromat. Between 5:30 p.m. and 6:00 p.m., Bobby observed the woman's young son leave the insurance company with a man that Bobby had seen on prior occasions. In the past, the man had been driving a green motorcycle. The man and boy held hands as they walked toward the laundromat and proceeded around the corner. The boy seemed comfortable with the man. Bobby noticed that the woman's vehicle was still at the laundromat at 10:30 p.m. and at 8:00 a.m. the following morning. Although Bobby initially identified a person other than Martinez in a police photo lineup, at trial he identified Martinez as the person he had seen walking around the corner with the young boy.

At about 5:30 p.m. on Friday, Martinez asked Gustavo Olivares to lend him his blue Ford Ranger so that he could retrieve a letter from Juanita that would permit A.L. to travel with him. Gustavo testified that A.L. stayed with him and played with neighbors while Martinez was gone. Martinez was driving Gustavo's truck when he arrived at Rivera's house between 5:00 p.m. and 5:30 p.m. to drop off three pieces of

5

luggage. When Martinez returned to Gustavo's forty minutes later, Gustavo saw Martinez throw something in the dumpster. Martinez seemed serious.

Martinez's neighbor, Veronica Gomez, observed him leave at about 4:30 p.m. on Friday in a Ford truck and saw him return with A.L. in the truck between 5:40 p.m. and 5:50 p.m. When he returned, Martinez almost collided with Veronica as she was leaving. Unlike earlier in the day, Martinez looked bothered and upset, and his face was pale, almost white, as if he had seen a ghost. Veronica also saw Martinez throw something in the dumpster. On another occasion, Martinez had told Veronica that he would like his parents to know his son, but he did not state that he would take A.L. to Mexico for that purpose.

As requested, Gustavo thereafter drove Martinez and A.L. to Rivera's house, and they arrived at 7:00 p.m. Rivera and his passengers, including his seventeen-year-old daughter, Myra, Martinez, A.L., and two other men, left for Mexico at approximately 8:15 p.m. on Friday evening. Martinez did not make plans to return from Mexico and told Rivera that A.L.'s mother would pick him up at the border in several weeks. After arriving in Mexico on Saturday, December 13, 2014, someone told Rivera that he had observed scratches on Martinez's neck and arms.

On Saturday morning, Juanita was scheduled to work from 10:00 a.m. to 5:00 p.m. Carlos attempted to contact Juanita after she failed to meet him at 8:00 a.m. as planned. Juanita did not respond to his text messages and phone calls.

6

After customers called Maria on Saturday morning and reported that they were unable to enter the insurance office and make payments, Maria and her husband, Robert, arrived at the business between 3:00 p.m. and 4:00 p.m. and noticed that Juanita's white car was parked at the laundromat, which was unusual. After Maria opened the office, Robert discovered Juanita's cold body on the restroom floor. Juanita's face was bloody, purple, and swollen, and blood was everywhere. The recording of Robert's 911 call was published to the jury. Maria and a police officer observed no signs of forced entry into the business.

Early Sunday morning, Myra notified her father that A.L. was the subject of an Amber Alert and that Martinez had kidnapped his son. Myra and Rivera spoke with police after returning to Denton from Mexico.

According to crime scene investigator Donna Krouskup, Juanita suffered trauma and bruising to her neck, which also showed many marks that may have been self-inflicted as Juanita attempted to remove something from her neck. Krouskup explained that those injuries could not have been caused by mere covering of Juanita's mouth, and Denton Police Sergeant Keith Martin testified that based on his training and experience, the injuries to Juanita's face and neck were consistent with the use of a person's hands or an object. Juanita suffered trauma to her left eye and had defensive wounds on her hands. In addition to the other injuries, one or more of Juanita's teeth had been chipped or knocked out. Krouskup testified that the scene where Juanita's body was found indicated that Juanita's attacker wanted her to die.

7

Texas Ranger Claire Barnes noted that the scene reflected a lot of aggression or passion.

Martinez was extradited from Mexico in 2017. During his return flight to the United States, Martinez volunteered that he had learned that DNA was present under "the person's"[5] fingernails. Martinez stated that "the person" had slapped him and suggested that was the reason DNA may have been present under "the person's" fingernails. He additionally noted that "the person['s]" boyfriend should be investigated as a suspect because the boyfriend had found out about Martinez's relationship with "the person." However, Carlos had been cleared as a suspect in Juanita's death. DNA testing showed that neither Martinez, nor his patrilineal relatives such as A.L., could be excluded as a contributor of the Y chromosome DNA retrieved from Juanita's fingernails and hand swabs.

During his recorded custodial interview, Martinez gave an account of his last encounter with Juanita. Martinez said that Juanita had agreed to permit him to take A.L. to Mexico for a month or so to spend time with his family during Christmas, and he went to Juanita's workplace at noon to pick up A.L. After he left his suitcases with Rivera, Martinez returned to Juanita's workplace at approximately 5:30 p.m. or 6:00 p.m. to say good-bye to Juanita. A.L. slept in Gustavo's truck while Martinez retrieved A.L.'s belongings from Juanita. Juanita provided him A.L.'s birth certificate

---

[5]Martinez never referred to Juanita by name.

8

for inspection at the border, and she agreed to pick up A.L. in Mexico afterward. Juanita became angry because she knew Martinez was going to Mexico without her. Juanita slapped Martinez, and he reacted by hitting her. Later, Martinez stated that Juanita "wanted to scream for someone [to] help her and for me not to be hitting her but I did not hit her[.]" Martinez subsequently said his instinct was to hit Juanita, and he hit her, and then Juanita "hit herself," fell, and screamed. Juanita's screaming scared Martinez. Because he did not want Juanita to scream, Martinez covered Juanita's mouth until she did not move and he then realized "it was too late." Martinez declared that when they were a couple, Juanita had agreed that they would travel to Mexico as a family to permit A.L. to learn Spanish during a one-to-two year period and that Juanita would then bring A.L. back to the United States.

Juanita's niece, Blanca, and Juanita's employer, Leticia Sanchez, testified that Juanita had never planned to go to Mexico, either alone or with A.L. Barnes testified that if one person slaps another, the self-defense laws of Texas do not permit the slapped person to respond by brutally beating and strangling that person and that there must be a very good reason for killing a person in self-defense.

## III. DISCUSSION

### A.    Sufficiency of the Evidence

We first address Martinez's second issue in which he contends that the evidence is insufficient to support his conviction. In support of this contention,

Martinez notes, without argument, that a key element of the charged offense of murder is that a person intentionally or knowingly causes the death of an individual.

### 1. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). In reviewing all the evidence, we consider both properly and improperly admitted evidence. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light

10

most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. Motive and opportunity are not elements of a criminal offense but can be circumstances that indicate guilt, and we may properly consider them in conducting a review for evidentiary sufficiency. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). "Having the opportunity to murder someone and then fleeing the crime scene is a circumstance of guilt." *Ingerson v. State*, 559 S.W.3d 501, 510 (Tex. Crim. App. 2018).

## 2. Hypothetically Correct Jury Charge

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599. A hypothetically correct jury charge reflects the governing law, the indictment, the State's burden of proof and theories of liability, and an adequate description of the offense for the particular case. *Hernandez v. State*,

556 S.W.3d 308, 315 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Jenkins*, 493 S.W.3d at 599 (stating that a hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict its theories of liability, and adequately describes the particular offense for which the defendant was tried, and that the "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

> In Texas, a person commits the criminal offense of murder if the person:
>
> (1) intentionally or knowingly causes the death of an individual;
>
> (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or
>
> (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Tex. Penal Code Ann. § 19.02(b).  A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his

conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* The term "serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *Id.* § 1.07(a)(46).

The amended indictment specified that Martinez:

on or about the 12th day of December, 2014 and anterior to the presentment of this Indictment, in [Denton] county and state [of Texas], did then and there intentionally or knowingly cause the death of an individual, namely, [Juanita], by strangling [Juanita] with defendant's hand or unknown object, or by striking [Juanita] with defendant's hand, or by striking [Juanita] with an unknown object;

And . . . on or about the 12th day of December, 2014, and anterior to the presentment of this Indictment, in the county of Denton and State of Texas, did then and there, with intent to cause serious bodily injury to an individual, namely, [Juanita], commit an act clearly dangerous to human life that caused the death of [Juanita], by strangling [Juanita] with defendant's hand or unknown object, or by striking [Juanita] with defendant's hand, or by striking [Juanita] with an unknown object; against the peace and dignity of the State.

Therefore, under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that on or about December 12, 2014, Martinez murdered Juanita by intentionally or knowingly causing her death by strangling Juanita

13

with his hand or an unknown object, or by striking Juanita with his hand or with an unknown object, or with intent to cause serious bodily injury to Juanita, committed an act clearly dangerous to life that caused Juanita's death by strangling Juanita with his hand or an unknown object, or by striking Juanita with his hand or an unknown object. *Hernandez*, 556 S.W.3d at 315 (citing *Malik v. State*, 953 S.W.2d at 240). A culpable mental state must generally be inferred from the circumstances. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018).

### 3. Analysis

After a thorough review of the record, and giving proper deference to the jury's verdict, we conclude that the evidence is sufficient to support Martinez's murder conviction. *Temple*, 390 S.W.3d at 360. Although he specifically complains that the State's evidence was not sufficient to establish beyond a reasonable doubt that he intentionally and knowingly murdered Juanita, Martinez acknowledges on appeal that it was the jury's prerogative to weigh the evidence and accept or reject any witness testimony.

During his custodial interview, Martinez acknowledged that he went to Juanita's workplace in Denton on December 12, 2014, at approximately 5:30 p.m., alleged that Juanita slapped him, and admitted that after he began hitting Juanita and she screamed, he placed his hand over Juanita's mouth until "it was too late." While Martinez implicitly suggests that he did not act intentionally or knowingly in killing Juanita, other evidence supports the jury's finding that he did.

14

The culpable mental state for murder can be inferred from a defendant's motive. *Nisbett*, 552 S.W.3d at 267. There was evidence that Martinez had a motive to act as he did. Various witnesses testified that Martinez wanted to take his son to Mexico, and contrary to his assertion that Juanita had agreed to this, the jury had before it evidence that Juanita was afraid that Martinez would abscond to Mexico with their son and had instituted custody proceedings to foreclose that possibility.

Other evidence showed that Martinez began his preparations to take A.L. to Mexico weeks earlier by selling his personal belongings and wiring money to Mexico. Although the evidence of A.L.'s location at the time Juanita was killed is contradictory, there was some evidence that Martinez left A.L. with Gustavo while he went to retrieve A.L.'s travel papers from Juanita. Within a day of killing Juanita, Martinez was in Mexico with their son. In this case, the evidence of Martinez's preparations to flee with A.L. supported the inference that the jury could have found as to the requisite intent, arising from his motive, to kill Juanita.

A defendant's culpable mental state may also be inferred from the extent of the victim's injuries. *Nisbett*, 552 S.W.3d at 267. The forensic evidence regarding Juanita's injuries and death supports a finding that Martinez acted intentionally and knowingly in causing Juanita's death.

Tarrant County Medical Examiner Dr. Susan Roe testified that Juanita suffered asphyxia trauma. Juanita's neck bore hemorrhages due to trauma, as well as bilateral

fractures of the cricoid ring.[6] The abrasions and bruising on Juanita's neck were consistent with manual asphyxiation by hand, the underlying injury to her airway was consistent with pressure on that area, and the injuries reflected that there may have been a component of ligature by an object, something perhaps as simple as the clothing present on Juanita's body. There were also injuries toward the back of Juanita's neck, possibly from encircling hands. Multiple markers of asphyxia, including subdural dot hemorrhages known as petechiae, were present in various parts of her body and in her eyes. Asphyxia, the lack of oxygen, may be achieved by manual and ligature strangulations, and Roe expounded that if "quite a bit" of pressure is applied long enough to the airway, which includes the hyoid bone, thyroid gland, trachea, and cricoid cartilage, as well as blood vessels and nerves, a person will lose consciousness, and may sustain damage to the underlying structure. Roe explained that the process of death from manual or ligature strangulation is not quick and "takes a fair . . . number of minutes." This testimony casts doubt on Martinez's suggestion that he accidentally killed Juanita.

------

[6]Dr. Dana Austin, a forensic anthropologist, examined Juanita's cricoid, which is nestled under the thyroid cartilage. Juanita's cricoid was broken on both sides, indicating that a squeezing pressure caused the fracture. It is possible for the injury to be inflicted by hand, by ligature, or by anything that compresses the neck. However, Austin explained that such fractures do not occur accidentally in the absence of a lot of force, such as a fall, and Austin explained that simply placing one's hand over a nose and mouth would not be sufficient to fracture Juanita's cricoid.

Roe's examination also revealed that Juanita suffered blunt force trauma resulting in subgaleal, subdural, and subarachnoid hemorrhages in her brain and skull area; contusions or bruises in the temporal and inferior frontal lobes of her brain; and a fracture in the back of her skull. The contusions indicate that Juanita either fell or was pushed or that her head was slammed with sufficient force that her brain was in motion when her skull fractured. Juanita's face was either "struck into something or something was struck into her face[,]" such as a hand or an object. Roe noted that Juanita's skull fracture was significant because it is a marker of the amount of force applied to the area, and creating a fracture in that area that radiates down into the posterior fossa, as in this case, required a significant amount of force such as a severe slamming into a floor or an area with a hard surface.

Juanita also suffered fractured ribs and hemorrhages within her abdominal cavity and in the area around her left kidney and damage to her adrenal gland. The upper pole of Juanita's left kidney was also torn, an injury that requires a significant amount of force because the kidneys are deep and well-protected.

Roe explained that the blunt force injuries to Juanita's brain and skull could have been lethal alone, that the asphyxia injuries could have been lethal, and that the combination of the blunt force and asphyxia injuries were lethal and caused Juanita's death. She determined that Juanita's manner of death was homicide.

From the evidence about the severity of Juanita's injuries, the jury was permitted to infer that Martinez intentionally and knowingly killed Juanita. Viewed in

17

the light most favorable to the jury's verdict, a rational juror could have found Martinez guilty of all elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622. Therefore, the evidence is sufficient to show that Martinez acted intentionally and knowingly and caused the death of Juanita. And even if the evidence had not been sufficient to prove the *mens rea* element that Martinez intentionally and knowingly caused Juanita's death, the evidence was sufficient to show that Martinez intended to cause serious bodily injury and committed acts that were clearly dangerous to human life and killed Juanita. *See* Tex. Penal Code Ann. § 19.02(b)(2). Because the evidence is sufficient to support the jury's verdict, we overrule Martinez's second issue.

## B. Self-Defense Instruction

In his first issue, Martinez contends that the trial court erroneously denied him a jury instruction on self-defense. We disagree.

### 1. Standard of Review

We must review "all alleged jury-charge error . . . regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.* A trial court must charge the jury on a defensive theory to the charged offense when properly requested and raised by any evidence, regardless of its substantive character. *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997) (discussing jury charge on voluntariness). We must analyze a trial court's refusal to

18

give such an instruction for harm. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex. Crim. App. 2013) ("Harm does not emanate from the mere failure to include the requested instruction."); *Payne v. State*, 11 S.W.3d 231, 232–33 (Tex. Crim. App. 2000).

### 2. Applicable Law

#### a. Self-Defense Instruction

The defendant's testimony alone may suffice to raise a defensive theory requiring an instruction in the charge. *Brown*, 955 S.W.2d at 279. If the confession and avoidance doctrine applies, the defendant must admit to the conduct—both act and culpable mental state—of the charged offense to be entitled to the instruction. *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010) ("The confession and avoidance doctrine applies to the necessity defense."). The doctrine does not apply when the defensive issue, by its terms, negates the culpable mental state. *Id.* at 402.

Self-defense is a justification defense that arises only when "the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state but interposes the justification to excuse the otherwise criminal conduct." *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007); *see* Tex. Penal Code Ann. §§ 9.02, 9.31(a); *Ex parte Nailor*, 149 S.W.3d 125, 132–34 (Tex. Crim. App. 2004). Restated, a defendant must first admit that he committed the offense, offering self-defense as a justification, to be entitled to a self-defense instruction. *See Nailor*, 149 S.W.3d at 133.

To qualify for a self-defense instruction, the defendant must meet the requirements set out in sections 9.31 and 9.32 of the Texas Penal Code. Tex. Penal Code Ann. §§ 9.31, 9.32. Section 9.31(a) justifies the use of force "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Section 9.32 justifies the use of deadly force "if the actor would be justified in using force against the other under Section 9.31[,] and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(1), (2)(A). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Penal Code § 9.01(3); *See Ferrel v. State*, 55 S.W.3d 586, 592 (Tex. Crim. App. 2001) (stating that force that results in serious bodily injury or death is, by definition, deadly force).

### b. Deadly Force Justification

To be justified in using deadly force in self-defense, the Penal Code does not require that a defendant intend the death of an attacker.[7] *Alonzo v. State*, 353 S.W.3d 778, 782–83 (Tex. Crim. App. 2011). Instead, the self-defense provisions focus on

---

[7]Juanita died from her injuries. Accordingly, because Martinez used deadly force, he was not entitled to a self-defense instruction on non-deadly force. *See Denman v. State*, 193 S.W.3d 129, 135 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

the actor's motives and on the level of force used, not on the outcome of that use of force. *Id.* at 783. If the defendant reasonably believed that the force was necessary to protect himself against another's unlawful use of force, and the amount of force actually used was permitted by the circumstances, sections 9.31 and 9.32 apply, regardless of the actual result of the force used. *Id.*

The statute necessarily contemplates that the force used by a defendant must be reasonable as contemplated from the defendant's point of view. *Reed v. State*, 703 S.W.2d 380, 384 (Tex. App.—Dallas 1986, pet. ref'd) (per curiam). The record therefore must contain some evidence of the defendant's state of mind or observable manifestations of the defendant's state of mind at the time of the alleged act of self-defense. *Id.* at 385. That evidence must show the defendant had "some immediate apprehension or fear of being the recipient of the unlawful use of force by the complainant." *Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984); *Garcia v. State*, No. 05-12-01693-CR, 2014 WL 1022348, at *6 (Tex. App.—Dallas Mar. 13, 2014, pet. ref'd) (mem. op., not designated for publication) ("When the force used is deadly force, as in this case, the defendant must show he believed he was in immediate apprehension or fear that the deceased was about to kill or seriously injure him.").

### 3. Analysis

#### a. *Evidence of Belief of Immediate Apprehension or Fear*

We examine the record to determine whether there was some evidence to show that Martinez reasonably believed that his use of deadly force was immediately necessary to protect himself against Juanita's possible use of unlawful deadly force. *Id.* In his recorded interview, Martinez admitted that he hit Juanita after she ostensibly slapped him first. He explained that he covered Juanita's mouth until she stopped moving because she was screaming after he hit her, and Juanita's screaming scared him.

However, a blow to the face with an open or closed hand does not justify deadly force. *Ogas v. State*, 655 S.W.2d 322, 324 (Tex. App.—Amarillo 1983, no pet.); *see Smith v. State*, 638 S.W.2d 208, 210 (Tex. App.—Fort Worth 1982, no pet.) (holding that appellant was not justified in using deadly force against the decedent because use of deadly force could not have reasonably been believed to be *immediately necessary* to protect himself against decedent who struck defendant and pulled a gun but did not advance). This evidence does not show that Martinez hit Juanita or covered her mouth because he believed he was in immediate apprehension or fear that Juanita was about to kill or seriously injure him. *See Ogas*, 655 S.W.2d at 324; *see also Smith*, 638 S.W.2d at 210.

Forensic testing showed that Martinez could not be excluded as a contributor of DNA evidence retrieved from Juanita's fingernails. Although Martinez asserted

that Juanita slapped him, and there was evidence that Juanita may have fought Martinez, there is also evidence that Juanita's hands bore defensive wounds, which permitted the jury to infer that she may have fought Martinez while defending herself. Many of the marks on Juanita's neck were described as possibly self-inflicted from her attempts to remove something from her neck. Rivera testified that someone told him that Martinez was seen with scratches on his body the day after Juanita was killed. However, this evidence does not show that Martinez reasonably believed that he was in immediate apprehension or fear that Juanita was about to kill or seriously injure him.

While there was some evidence that Juanita's skull and brain injuries were consistent with a fall, the extent and brutality of those and other injuries were significant and may have resulted from a hand or an object striking Juanita's face or from her face striking a hand or object. Juanita's asphyxia and the markings and injuries to her neck and throat were consistent with manual strangulation, which required constant pressure for minutes. Juanita suffered trauma to her face; broken ribs; significant internal injuries including hemorrhages, a torn kidney pole, and a broken cricoid; and blunt force trauma to her head and body.

Viewed in the light most favorable to him, we are unable to conclude that Martinez's evidence establishes that he used deadly force because he believed he was in immediate apprehension or fear that Juanita was about to kill or seriously injure him. *See Ferrel*, 55 S.W.3d at 591; *Garcia*, 2014 WL 1022348, at *6. Because no

23

evidence supports granting Martinez's requested self-defense instruction, the trial court did not err by denying the instruction.

### b. Harmless Error for Failing to Instruct on Self-Defense

But even assuming that the trial court erred by not including a self-defense instruction in its charge to the jury, we conclude that the lack of instruction was harmless.

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly preserved error, unless harmless, requires reversal. *Almanza*, 686 S.W.2d at 171. A reviewing court must consider and analyze: (1) the jury charge as a whole; (2) the arguments of counsel; (3) the entirety of the evidence; and (4) other relevant factors present in the record. *Reeves*, 420 S.W.3d at 816; *see Almanza*, 686 S.W.2d at 171 ("[T]he actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.").

24

Assuming that Martinez's statement that Juanita slapped him first warranted a self-defense instruction, and assuming that the trial court erred by failing to give the requested instruction, we look first to the jury charge as a whole in analyzing whether Martinez suffered some harm. In addition to its instructions regarding Martinez's presumption of innocence, his plea of not guilty, the State's burden of proof, requisite definitions and application paragraphs, and instructions on other matters, in its charge the trial court instructed the jury on the elements of murder, manslaughter, and criminally negligent homicide. As a whole, the jury charge permitted the jury to acquit Martinez, or if it believed the State had established the elements of the respective offense beyond a reasonable doubt, to find Martinez guilty of murder, manslaughter, or criminally negligent homicide.

We next look to "other relevant factors in the record." *Reeves*, 420 S.W.3d at 816. Both Martinez and the State addressed self-defense during voir dire. Collectively, those discussions comprised a total of nine pages of the 220 pages of voir dire. Noting that self-defense is an issue that may be raised during a murder trial, the State explained that to assert self-defense, a person must not provoke an action and must hold a reasonable belief that a use of force is immediately necessary to protect himself from unlawful force being used against him, and the responding force must be proportional. Defense counsel noted that a person is justified in using force against another person if the amount of force is reasonable, and the person perceives that someone is going to use force against him. Defense counsel further explained

25

that the defendant is responsible for presenting and proving that self-defense was immediately necessary and clarified that there is no duty to retreat. Potential jurors answered the State's and defense counsel's questions to demonstrate an understanding of those requirements.

Martinez's recorded statement that Juanita had slapped him and that he hit her was published to the jury. Graves also testified that in Texas, a slapped person cannot brutally beat and strangle a person who slaps him and that a person who kills in self-defense must have a very good reason to do so.

During closing arguments, the State made a single reference to Juanita's purported slap. The State contended that during his police interview, Martinez minimized what he had done to Juanita. It asserted that if Juanita had slapped Martinez, he had not beaten and strangled her as a result of being scared when she screamed after he beat her. Rather, the State argued, Martinez entered Juanita's workplace with the intent to kill and repeatedly struck Juanita out of anger and covered her mouth and nose to prevent her from screaming. These violent acts, the State argued, were not accidental or reckless, but were intentional as evidenced by Martinez's strangling Juanita for minutes until she took her last breath. The State urged the jury to not be confused by language in the charge regarding recklessness and criminal negligence, because the cause of Juanita's death was not accidental.

Defense counsel argued that the case was not about Martinez or Juanita but instead was about A.L. and admitted that Martinez's acts were neither accidental nor

intentional but were reckless, an element which is required to support a manslaughter conviction. *See* Tex. Penal Code Ann. § 19.04. Defense counsel acknowledged that Martinez pushed Juanita with such force that her skull fractured when striking a doorknob, that the bruising on her face was possibly caused by striking the toilet, and that her neck bore strangle marks. Counsel argued that Martinez "meant" but did not intend what he did. Rhetorically asking what could cause a person to be so brutal and violent, defense counsel answered that on learning that he might lose full access to his son, either by being denied full custody or permission to travel with him, and that his son might never meet his purportedly ill grandfather and would be living with Juanita and Carlos, Martinez's passion and love for his son caused him to behave recklessly in an angry, brutal, and violent manner toward Juanita. At worst, defense counsel argued, Martinez was guilty of manslaughter because of his reckless conduct. Defense counsel made no reference during closing argument to Juanita's alleged act of slapping Martinez, did not suggest that a slap triggered Martinez's subsequent violent acts, and did not argue that Martinez acted in self-defense.

Neither Martinez's evidence nor the evidence as a whole shows that Martinez believed he was in immediate apprehension or fear that Juanita was about to kill or seriously injure him such that his use of deadly force against Juanita would be permitted in self-defense. *See Ferrel*, 55 S.W.3d at 591; *Smith*, 676 S.W.2d at 585. The jury was permitted to find Martinez guilty of other lesser culpable charges but instead determined that Martinez intentionally and knowingly killed Juanita, and in doing so,

found that it was Martinez's conscious objective or desire to kill Juanita or that he was aware that his conduct was reasonably certain to cause her death. *See* Tex. Penal Code Ann. § 6.03(a), (b).

Looking at the entirety of the evidence, Martinez's self-defense theory was undermined throughout trial. Significant evidence showed, among other things: (1) that Martinez made travel arrangements to leave the country with A.L., sold his motorcycle and personal belongings, and transferred the money to his father; (2) that Juanita was fearful of Martinez and was seeking sole custody of A.L. and would be moving with him to live with Carlos; (3) that Martinez did not park on December 12, 2014, in front of Juanita's workplace, which was discovered locked with Juanita inside, and that Juanita's car was moved and parked away from her workplace on the day she died; and (4) that after Martinez met with Juanita at her office, he did, in fact, leave the country with A.L. as he had planned. This and other evidence, along with evidence of Juanita's brutal injuries and death, do not show that Martinez acted in self-defense, and it is unlikely that a jury would have found that Martinez acted in self-defense after rejecting the lesser-included charges of manslaughter and criminally negligent homicide and finding him guilty of murder.

Under this harm analysis, any error in failing to give the requested self-defense instruction was not "calculated to injure the rights of [Martinez]," and we conclude that Martinez suffered no harm from the trial court's failure, if error, to grant the

28

requested self-defense instruction.  *See* Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor,* 871 S.W.2d at 732.  We overrule Martinez's first issue.

## IV.  CONCLUSION

Having overruled both of Martinez's issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 16, 2019