**Opinion issued October 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-22-00740-CR**

———————————

**CAMERON J. MOORE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1711760**

## MEMORANDUM OPINION

Appellant Cameron J. Moore was found guilty by a jury of the offense of felony murder. *See* TEX. PENAL CODE § 19.02(b)(3). The jury assessed Moore's punishment at life in prison. In three issues on appeal, Moore contends that the evidence was insufficient to support his conviction because the State failed to

corroborate an accomplice witness's testimony (issue one) and that the trial court abused its discretion in denying his motion to suppress his oral statement and in admitting the statement into evidence (issues two and three).

We affirm.

## Background

In the early morning hours of June 9, 2019, eleven-year-old Kevin[1] was asleep in the front bedroom of his home on North Brentwood Street in Channelview, Texas. Kevin and his family had moved into the house about two months earlier. Around 4:20 a.m., a car approached the home. Surveillance video from neighboring homes captured what happened next. The car stopped in front of Kevin's home. The car's passenger got out and fired what was later determined to be an assault rifle toward the home. After the passenger got back in, the car went down the street and turned around in a neighbor's driveway. When the car drove by Kevin's home the second time, the passenger fired what was later determined to be a 9-millimeter pistol over the roof of the car toward Kevin's home. Bullets fired from the weapons hit a vehicle parked in the driveway, breaking its back windshield, and hit the home.

One of the bullets pierced the bedroom wall where Kevin was sleeping. The bullet struck Kevin in the chest, killing him. Assistant medical examiner Dr. Darshan

---

[1] We use a pseudonym to refer to the minor complainant. *See* TEX. R. APP. P. 9.10(a)(3).

2

Phatak testified at trial that, from her autopsy, she determined that Kevin's cause of death was a "gunshot wound of the posterior torso through the chest" and that the manner of his death was homicide. The amount of damage to Kevin's body and the size of the exit wound led Dr. Phatak to believe that Kevin was shot by a rifle. She confirmed that nothing led her to believe that Kevin was shot at close range.

The Harris County Sheriff's Department investigated the homicide and obtained surveillance video from Kevin's neighbors. From the video, investigators determined that the car involved in the shooting was a blue Chevrolet Impala with rear-end damage. But the occupants of the Impala could not be seen with sufficient detail to be identified.

The day after the shooting, the Impala was found parked on a residential street less than two miles from Kevin's house. Nine-millimeter shell casings were found on the roof of the vehicle and also at the bottom of the windshield. At Kevin's home, investigators collected 7.62-millimeter and 9-millimeter shell casings fired from two firearms. Forensic testing showed that the 9-millimeter shell casings recovered from the Impala were fired from the same unknown firearm as the shell casing recovered from the home.

Investigators determined that the Impala was registered to Sonnie Reyes. Detective A. Thompson with the Homicide Division of the Harris County Sheriff's

Office interviewed Reyes a couple weeks later. Reyes admitted that he was involved in the shooting at Kevin's home. Reyes also implicated Moore in the shooting.

From Reyes, Detective Thompson learned that, a couple of hours before the shooting, a drive-by shooting had occurred at Moore's house where he lived with his mother. No one had been injured in that shooting, but their house and car were damaged.

Detective Thompson learned that Deputy A. Jimenez had been dispatched to Moore's house to investigate that shooting shortly after 2:00 a.m. on June 9. He obtained the footage from Deputy Jimenez's body-worn camera. In the video, Deputy Jimenez asked Moore if he knew "anyone who would do something like this." Moore responded that he did. He said that he was "pretty sure [he knew] exactly who it was." He said that he "probably used to hang with them" but then walked away. An eyewitness told Deputy Jimenez that she was sitting in her car when she saw two male assailants in a white Pontiac shoot at Moore's house with pistols. When asked the assailants' race, she said that they were Black. Moore indicated that he saw the assailants from an upstairs window. He said that the assailants were "Mexican," not Black.

Moore's mother indicated that Moore knew who the assailants were, and Moore responded that he did. He stated that he "already got everybody researching." Throughout the video, Moore is shown looking at his cell phone. Deputy Jimenez

4

testified that Moore was "trying to process what [had] happened" and "trying to figure out who had—who could have done this to his car." Deputy Jimenez testified that Moore was uncooperative and unwilling to share whatever information he had. Moore never told Deputy Jimenez who he thought the assailants were other than to say it was "someone around the area."

When asked about Moore's demeanor, Deputy Jimenez testified that Moore "was angry." He stated that "[i]t seemed like he knew who had done it and he was thinking of his next—what he was going to do next." At one point, Deputy Jimenez muted the microphone on his body-worn camera. He testified that he was "trying to reason" with Moore. Deputy Jimenez stated that he believed that Moore "knew more than what he was telling [him]." He said that he was trying to tell Moore "that it wasn't worth it" and to convince Moore to talk to him, but he "wouldn't talk."

During the investigation of Kevin's homicide, Detective Thompson obtained a search warrant for an Instagram account associated with Moore. The Instagram records showed that at 2:50 a.m., while Deputy Jimenez was still at Moore's house, an Instagram message was sent from Moore's account to "Jackboy_marcos," an account associated with someone named Marcos.[2] The message stated, "I'm a kill you boy." Another message, sent from Moore's account to Marcos at 3:29 a.m., stated, "Come back."

---

[2] The record does not definitively reflect a surname for Marcos.

As part of his investigation, Detective Thompson determined who had resided at Kevin's home before Kevin and his family moved in two months before the shooting. Detective Thompson determined that a mother and her son had lived there. Detective Thompson spoke to the mother and learned from her that Marcos—who Moore had threatened in a message to kill—"used to hang around the house." She said that Marcos sometimes stayed at the house "over the weekend."

The Instagram records also showed that, around 7:00 p.m. on June 9, Moore received a message from the account of htx.moore, who Moore testified at trial was a relative. The relative asked Moore, "Yall [sic] went back to the house[?]" Moore responded, "Yup." Two days later on June 11, the relative messaged Moore, "They still tal[king] bout what happen[e]d on the news." The relative also said, "They said they still don[']t have a lead" and then sent two smiley emojis. Moore responded, "God bless." The relative added, "They don[']t find out." Moore then messaged, "Unsend all these m[e]ssages." The relative responded, "I did."

The investigation also revealed that, about two weeks before the shooting, Reyes purchased an assault rifle. Reyes was arrested about one month after the shooting. While he was in jail, Reyes instructed a friend, Ivan Ramirez, to get rid of the rifle. A friend of Ramirez kept the rifle at his home. Detective Thompson learned of the rifle's location and retrieved it from Ramirez's friend. Ballistic testing showed that the weapon was the assault rifle used in the shooting at Kevin's home. DNA

6

testing of the weapon revealed only the DNA of Ramirez and his friend. The 9-millimeter pistol used in the shooting at Kevin's home was never located.

Moore's fingerprints were found on the outside of the driver's-side door of Reyes's Impala. His fingerprints were not found anywhere else on the car.

After Kevin's murder, Moore and his mother moved to Beaumont. Using Moore's Instagram posts, Detective Thompson located Moore there in November 2019.

Detective Thompson interviewed Moore twice—in November 2019 and again in February 2021. The February 2021 interview was admitted into evidence at trial but the November 2019 interview was not admitted. However, Detective Thompson testified about both interviews.

When Moore was interviewed by Detective Thompson in November 2019, Reyes had already been indicted for Kevin's murder. Detective Thompson testified that Moore spoke with him voluntarily. During the interview, Moore mentioned that his house had been "shot up" and that Moore had "basically said" that Reyes had taken "care of it for him." Initially, Moore told Detective Thompson that he did not know how Reyes found out about the shooting at his house. He then "changed his story," stating that he had called Reyes to tell him about the shooting. Detective Thompson testified that Moore's social media and cell phone records did not reflect

7

that Moore and Reyes communicated between the time of the shooting at Moore's house and the shooting at Kevin's house.

In February 2021, Detective Thompson wanted to reconnect with Moore, so he called Moore's mother. Moore returned the call to Detective Thompson. Moore had moved back to Houston, and he agreed to meet Detective Thompson for another interview. Detective Thompson asked Moore to meet at the sheriff's office. Moore declined but texted that he would meet Detective Thompson in the parking lot of a Walgreen's drugstore and provided the address. Moore chose the time of the interview, which occurred on February 22, 2021, between 9:00 p.m. and 10:00 p.m. Moore drove his vehicle to the interview. Once at the Walgreen's, Moore got into the front seat of Detective Thompson's county-owned, unmarked vehicle where the interview took place. Another detective, Detective S. Silva, was in the backseat. The interview was audio-recorded and lasted about an hour and fifteen minutes.

At the beginning of the interview, Detective Thompson conveyed that he thought Moore and Reyes were responsible for the shooting at Kevin's house. He said that Reyes had told him a "wild story" implicating Moore in the murder, and he had no reason to disbelieve Reyes, who had no motive to commit the offense and had admitted to his own involvement. Detective Thompson told Moore, "[Y]ou obviously [are] involved with this, your house just got shot up. You thought it was Marco[s]. You thought Marco[s] still lived at that house on Brentwood. And it was

8

the wrong house." Detective Thompson conveyed that Moore's claim that Reyes had committed the shooting as a favor to him was not credible. He told Moore that he "need[ed] to know what happened, why it happened and who was ultimately responsible."

Moore denied going to Kevin's house that night. He told Detective Thompson that, after the shooting at his house, he called Reyes to confront him, believing that Reyes was responsible for the drive-by shooting at his house. He explained that he and Reyes were "feuding over a female." He said that Reyes denied responsibility for the shooting at Moore's house, and he claimed that Reyes told him that he was "gonna handle" it for him. Moore said that Reyes told him that knew "where to go." Detective Thompson asked Moore why Reyes was willing to do that for him. Moore indicated that Reyes had his own motives for retaliating against Marcos. Moore said that Marcos and his group had beaten up Reyes a year earlier and had given Reyes a black eye. Moore also said that his mother had helped Reyes when Reyes's mother had kicked him out.

Detective Thompson told Moore that he "put [Ramirez] in jail . . . for hiding [Reyes's assault rifle]" and that Ramirez had stated that he saw Moore at Reyes's house on the night of shooting. Moore denied being at Reyes's house that night.

Moore's mother had told Detective Thompson that Moore was home when the shooting at Kevin's house occurred. Detective Thompson told Moore several

9

times during the interview that his mother could get "in trouble" if she had lied about Moore being at home. Moore said that his mother had told the truth because he was at home the entire night.

About eight minutes into the interview, Detective Thompson told Moore, "[L]ook Cameron, I'm . . . trying to make you understand this[,] bro. It's coming to a close. Okay. Now eventually you going to get charged[.]" Moore asked Detective Thompson, "What proof do you have on me to prove the link [to] me [on] this?" Detective Thompson stated that he was "still waiting on the DNA" from the assault rifle involved in the shooting. Moore then indicated for the first time that he may have touched the rifle because Reyes brought it to his house to sell it to him one month before the shooting. Detective Thompson told Moore that Reyes purchased the assault rifle on May 28, so Reyes did not own it one month before the June 9 shooting as Moore claimed.

A few minutes later, Moore changed what he had told Detective Thompson. Moore said that, after he called Reyes about the shooting at his house, Reyes drove to his house and showed him the assault rifle. Moore said that "another Mexican guy," who he had never seen before, was also in the car with Reyes. Detective Thompson asked Moore why he was "just now telling [him]" that Reyes had come to his house with the assault rifle. Moore said he "was scared" and "didn't want to tell [Detective Thompson] that." He also disclosed that he handled Reyes's assault

10

rifle while standing outside the car, stating that he "played with" it and "racked the slide." Detective Thompson asked Moore to take a polygraph test. He indicated that, if he was telling the truth, Moore could be eliminated as a suspect.

Moore said that Reyes stayed at his house for about 10 minutes. During that 10 minutes, he sat in the backseat of Reyes's Impala and smoked "weed." He said that Reyes told him that he knew the location of Marcos's "trap house" and that "he was gonna shoot it up." He said that Reyes asked him to go with him, but he declined and stayed at home. Moore told Detective Thompson that he "specifically told [Reyes] not to even shoot at the house" but "[to] shoot at the cars." On further questioning, Moore stressed that he "didn't tell [Reyes] to kill anyone. . . . [He] just told [Reyes] to shoot at the cars[.]" At the end of the interview, Moore got out of Detective Thompson's vehicle and left in his own car.

Moore was later arrested and indicted for the offense of felony murder.[3] The indictment alleged that, on June 9, 2019, Moore

> intentionally and knowingly commit[ted] the felony offense of Deadly Conduct by discharging a firearm at and in the direction of a habitation [on North Brentwood Road] and was reckless as to whether the habitation was occupied, and while in the course of and furtherance of

---

[3] Under the Penal Code, a person commits felony murder when the person "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in the immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(3).

11

the commission of said offense did commit an act clearly dangerous to human life, to-wit: shooting [Kevin] . . .with a firearm and did thereby cause [his] death.

Moore moved to suppress his February 2021 oral statement. In his written motion, Moore asserted, inter alia, that his statement should be suppressed because it "was taken without a knowing, intelligent and full and complete understanding of [his] rights, as required by [*Miranda*[4]], and Article 38.22 of the Texas Code of Criminal Procedure." He also challenged the statement on the basis that it "was not freely and voluntarily made" because "the officers to whom the statement was made used misstatement, deception and trickery to get [Moore] to make the statement." Specifically, he claimed that the officers "told [him] that unless he talked to them at that time and made a statement, . . . he would not be able to make a statement at all after that."

The trial court conducted a hearing on the motion at the start of trial before the first witness was sworn. In his opening statement at the hearing, Moore asserted that his statement should be suppressed because he was not informed of his *Miranda* rights before he gave the statement, which he claimed resulted from a custodial interrogation. He asserted that, at the time of his statement, it was "clear that he was going to be charged with murder." He argued that the recorded statement should be suppressed because he "was in fear, scared, [and] intimidated" at the time he gave

---

[4]    *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966)

12

it. The State responded that Moore was not entitled to *Miranda* warnings because he was not in custody when he made the statement and that he had given the statement voluntarily.

A transcript of Moore's February 2021 statement was admitted into evidence at the suppression hearing, and the defense called Moore to testify. He stated that Detective Thompson told him early in the interview that "eventually [he] would get charged." Moore testified that, if his rights had been read to him, he would have exercised his right to remain silent. Moore acknowledged that, in the interview, he said that he told Reyes to shoot up the cars. Moore testified that the statement was not true because he never told Reyes to do that. When asked why he made the false statement, Moore testified that he felt "scared" and "intimidated." He explained that he "felt [he] had to tell [Detective Thompson] something to get him to back off and let [him] go about [his] day." Moore stated that Detective Thompson did not believe him when he said that he had "nothing to do with [the shooting]" and that Detective Thompson "just kept grilling [him] relentlessly." He agreed that he "told [Detective Thompson] what he wanted to hear to get out of there."

When questioned by the State, Moore acknowledged that he had initiated contact with Detective Thompson after the detective called his mother. Moore agreed that he had made the decision to call Detective Thompson and to meet with him. He also agreed that he had declined Detective Thompson's request to meet at

the sheriff's office. Instead, Moore chose the location and the time for the interview. Specifically, he chose to meet Detective Thompson in a Walgreen's parking lot between nine and ten o'clock at night. He affirmed that he drove to the location in his own car. He acknowledged that he was never told that he could not get out of the car during the interview, nor was he told that he was under arrest. Moore acknowledged that, after the interview concluded, he got out of Detective Thompson's car and left in his own vehicle.

The State called Detective Thompson to testify at the suppression hearing. Detective Thompson testified that, during the interview, Moore was not handcuffed and the doors of the car were unlocked. He said that Moore had been free to leave. Detective Thompson acknowledged that he was "part of the decision" to later charge Moore with Kevin's murder and that the decision to charge Moore was based in part on the February 2021 interview as well as other evidence collected during the investigation.

When questioned by the defense, Detective Thompson acknowledged that, during the interview, he told Moore that "eventually [he was] going to get charged." He also acknowledged that Moore was the "focus" of his investigation.

In closing argument at the suppression hearing, Moore argued that he was entitled to be informed of his *Miranda* rights because he was in custody when he gave his statement. He pointed out that he was the focus of the investigation and

14

cited Detective Thompson's remark that he was "eventually going to get charged." Moore asserted that he should have been informed of his *Miranda* rights as soon as Detective Thompson made the remark. Moore also asserted that his statement was not voluntary because he was "in fear, scared, [and] intimidated."

At the end of the hearing, the trial court ruled that Moore's February 2021 statement was admissible, thereby denying Moore's motion to suppress. In support of its ruling, the trial court orally found that the statement "was made freely and voluntarily," Moore "was not in custody," and he "was free to leave." The trial court also found that there was "no threats," and "[t]here was not any intimidation." The court further found that, "based on the [its] experience, that various tactics are used with respect to interviewing targets and/or suspects, and that it appear[ed] . . . that that was what transpired in this case."

The State called Detective Thompson to testify at trial about the investigation of Kevin's murder. This included testimony about the statements Moore gave in November 2019 and in February 2021. During his testimony, the State offered the audio recording of the February 2021 statement into evidence. Other exhibits offered by the State included the surveillance video from Kevin's neighbors, Moore's Instagram and cell phone records, and the video from Deputy Jimenez's body-worn camera. Other witnesses include Deputy Jimenez and forensic experts.

15

The State also offered the accomplice-witness testimony of Reyes, who had already pleaded guilty to Kevin's murder. Reyes testified that the State had subpoenaed him and that he was not receiving anything in return from the State for testifying.

Reyes stated that, on the night of June 8, 2019, he went to a club with some friends. He said that the club closed at 2:00 a.m., and he arrived home around 2:45 a.m. He and his friends had been hanging out at his house for "a little bit" when Reyes saw Moore walking down the street "coming to see [him]" around 3:00 a.m. Reyes confirmed that he and Moore had not previously communicated that night. Reyes saw that Moore was holding onto a 9-millimeter handgun that he had in the pocket of his basketball shorts. Moore told Reyes that his house had "just got shot up." He described Moore's demeanor as "angry" and "distraught."

Reyes testified that they drove to Moore's home in his car to look at the damage. Reyes was driving and Moore was in the passenger seat. No one else was in the vehicle. Before they left, Reyes had retrieved his assault rifle from his house and placed it in the backseat of his car. He said that it was already loaded.

Moore told Reyes that he thought that Marcos had shot up his house. Reyes testified that he did not know where Marcos lived, but Moore indicated that he did. While Reyes drove, Moore directed him to the house on North Brentwood where Moore thought Marcos lived.

16

Reyes testified that, on the first pass by the house, Moore used the assault rifle to shoot at the home. After they turned around and made a second pass, Moore used the 9-millimeter handgun. Reyes said that he was driving the entire time and that Moore had been in the passenger seat. Reyes denied that Moore told him "to go shoot up the cars" or to "shoot up anything."

Reyes said that, after the shooting, they went to Moore's house, and then he drove home. He learned about Kevin's death the next day from Moore.

The defense called Moore to testify. Moore stated that, not long after the drive-by shooting at his house, Reyes and Ramirez pulled into his driveway in Reyes's Impala. Moore acknowledged that he talked to Reyes and sat in the backseat of the Impala. He said that his mother came out of the house and questioned why Reyes was there. Moore testified that he did not leave with Reyes and that he stayed home the remainder of the night.

Moore also testified about his February 2021 statement. He stated that, had Detective Thompson informed him of his rights, he would have stopped the interview and left.

Moore testified that Detective Thompson indicated during the interview that his mother could "get in trouble" because "she witnessed that [he] did not leave the house." Moore acknowledged that he had admitted to Detective Thompson that he told Reyes to shoot up the cars. But Moore testified that was a false admission. He

17

said that he never told Reyes to shoot up the cars. When asked why he made the false admission, Moore testified, "Because I felt threatened. [Detective Thompson] was threatening my mother. He wouldn't—basically, like, he wouldn't let me leave. I felt like I had to tell him something so he would excuse me from the vehicle."

Moore acknowledged that, after the shooting at his house, he sent a message to Marcos threatening to kill him. He testified that he suspected Marcos was responsible for shooting at his home and sent the message to bait Marcos into returning to the scene to prove that Marcos was responsible for the shooting.

Moore's mother also testified. She stated that, after the drive-by shooting at her home, Reyes and another person pulled up to her house in Reyes's car. She said that Moore talked with Reyes outside for 15 to 20 minutes. She testified that Moore then came inside the house and stayed with her for the rest of the night.

The charge permitted the jury to find Moore guilty of the offense of murder as either the principal or as a party. *See* TEX. PENAL CODE § 7.01(a); *id.* § 7.02(a)(2) (providing that "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense"). The jury was also given an accomplice-witness instruction regarding Reyes's testimony.

18

The jury found Moore guilty of the offense of murder as charged in the indictment and assessed his punishment at life in prison. Moore appealed, challenging the judgment of conviction in three issues.

## Accomplice-Witness Corroboration

In his first issue, Moore asserts that "the evidence was insufficient to support [his] conviction because the accomplice witness testimony of Sonnie Reyes was not sufficiently corroborated."

## A.    Standard of Review and Relevant Law

An accomplice is a person who participates with a defendant in the charged offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. art. 38.14.

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon* v.

*State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). We view corroborating evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). If there are conflicting views of the evidence, one tending to connect the accused to the offense and the other not, we defer to the jury's view. *Smith*, 332 S.W.3d at 442. "[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.*

"[T]he corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone*, 253 S.W.3d at 257. Nor is it necessary "that the corroborating evidence directly connect the defendant to the crime[.]" *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). Instead, the corroborating evidence must only link the defendant in some way to the commission of the crime and show that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Malone*, 253 S.W.3d at 257 (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). The corroborating evidence need only "connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016) ("The corroboration requirement in Article 38.14 does not apply separately to each element of the offense charged or to each aspect of the accomplice's testimony.").

The corroborating evidence may be direct or circumstantial. *See Smith*, 332 S.W.3d at 442. "If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of Article 38.14 has been fulfilled." *Cathey*, 992 S.W.2d at 462.

## B.    Analysis

Here, the parties agree that Reyes was an accomplice witness. Thus, we disregard Reyes's testimony to determine if there was non-accomplice evidence tending to connect Moore to Kevin's murder.

Moore acknowledges that the non-accomplice evidence showed that he had a motive to shoot at Marcos's former residence, namely, the earlier shooting at his own home, which he attributed to Marcos. Moore correctly points out that, while motive may be considered in connection with other evidence which tends to connect the accused with the crime, motive alone is insufficient to corroborate accomplice witness testimony. *See Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988) (concluding evidence of affair could be considered in connection with all other evidence tending to connect appellant to wife's murder). Here, the non-accomplice evidence shows more than motive tending to connect Moore to Kevin's murder.

Non-accomplice evidence was presented about Moore's conduct before the offense tending to connect him to the offense. The Instagram records showed that, during the approximately two-hour period between the shootings at the two homes,

21

Moore sent Marcos a message threatening to kill him and then sent another message telling him to "[c]ome back."

Moore sent the first message to Marcos while Deputy Jimenez was at his home investigating the drive-by shooting there. In the video from Deputy Jimenez's body-worn camera, Moore indicates to his mother that he knew who the assailants were who shot their house. Deputy Jimenez testified that Moore was uncooperative and unwilling to share whatever information he had about who committed the shooting. When asked about Moore's demeanor, Deputy Jimenez testified that Moore "was angry." He stated that "[i]t seemed like he knew who had done it and he was thinking of his next—what he was going to do next." At one point, Deputy Jimenez muted the microphone on his body-worn camera. He testified that he was "trying to reason" with Moore. Deputy Jimenez stated that he believed that Moore "knew more than what he was telling [him]." Deputy Jimenez's testimony indicated that he believed that Moore was thinking about retaliating against the person that he believed had shot his house. Deputy Jimenez testified that he was trying to tell Moore "that it wasn't worth it" and to convince Moore to talk to him, but he "wouldn't talk."

"Evidence that the accused was in the company of the accomplice at or near the time or place of a crime—when coupled with evidence tending to connect the accused to the commission of the crime—properly corroborates accomplice testimony in support of a conviction." *Smith v. State*, 436 S.W.3d 353, 370 (Tex.

22

App.—Houston [14th Dist.] 2014, pet. ref'd) (citing *Hernandez v. State*, 939 S.W.2d at 178); *see Custard v. State*, 812 S.W.2d 82, 85 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd) (recognizing that appellant's statements that he was with accomplice at time of shooting, though he contended accomplice was shooter, tended to connect him to murder). Moore and his mother each testified that Moore was with Reyes during the period between the shooting at his house and the shooting at Kevin's house. They each testified that Reyes drove to their house and that Moore talked with Reyes outside by Reyes's car—the car used a short time later in Kevin's murder. The evidence also showed that Moore's fingerprints were on the outside driver's side door of Reyes's car.

In his November 2019 and February 2021 statements, Moore told Detective Thompson that he contacted Reyes to discuss the shooting of his house. Detective Thompson testified that, in the November 2019 statement, Moore "basically said [that Reyes] took care of it for him."

In his February 2021 statement, Moore revealed that he sat in the backseat of Reyes's car while Reyes was at his house. He also said that, at that time, he handled Reyes's assault rifle—one of the two firearm's used in the shooting at Kevin's home. Moore testified that he "played with" the rifle and racked the slide. *See Cockrum v. State*, 758 S.W.2d 577, 582 (Tex. Crim. App. 1988) ("Proof that connects an accused to a weapon used in an offense is proper corroborative evidence.").

23

Moore's statement also reflects that he and Reyes discussed retaliating against Marcos for the drive-by shooting at Moore's residence. He said that Reyes told him that he knew the location of Marcos's "trap house" and that "he was gonna shoot it up." He stated that Reyes asked him to come with him, but he stayed home and did not go. Moore told Detective Thompson that he "specifically told [Reyes] not to even shoot at the house" but "[to] shoot at the cars." On further questioning, Moore stressed that he "didn't tell [Reyes] to kill anyone. . . . [He] just told [Reyes] to shoot at the cars[.]" *See Joubert*, 235 S.W.3d at 731 (holding defendant's videotaped statement in which he admitted involvement in offense, but denied shooting victim, tended to connect him to offense; explaining that "appellant's liability as a principal or under a parties theory is of no relevance under an Article 38.14 analysis. The question is whether some evidence 'tends to connect' him to the crime; the connection need not establish the exact nature of his involvement (as a principal or party")).

Moore's conduct after Kevin's murder also tended to connect him to the offense. *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (recognizing that defendant's conduct after crime indicating consciousness of guilt is "one of the strongest kinds of evidence of guilt"). This includes messages between Moore and a relative. The Instagram records showed that, around 7:00 p.m. on June 9—the same day as Kevin's murder—Moore received a message from a relative.

24

The relative asked Moore, "Yall [sic] went back to the house[?]" Moore responded, "Yup." Two days later on June 11, the relative messaged Moore, "They still tal[king] bout what happen[e]d on the news." The relative also said, "They said they still don[']t have a lead" and then sent two smiley emojis. Moore responded, "God bless." The relative added, "They don[']t find out." From the exchange, the jury could have reasonably inferred that they were communicating about the murder. After the exchange, Moore then messaged the relative: "Unsend all these m[e]ssages." The relative responded, "I did." Attempting to conceal incriminating evidence tends to connect a defendant to an offense because it shows a consciousness of guilt. *See Lozano v. State*, 359 S.W.3d 790, 814 (Tex. App.—Fort Worth 2012, pet. ref'd) (noting that attempting to conceal incriminating evidence shows consciousness of guilt); *Simpson v. State*, 181 S.W.3d 743, 754 (Tex. App.—Tyler 2005, pet. ref'd) (indicating that evidence demonstrating consciousness of guilt can be used to corroborate accomplice-witness testimony).

In addition, portions of Moore's account of what occurred on the night of the murder shifted and changed over time. For instance, Detective Thompson testified that, during his November 2019 statement, Moore first said that he did not know how Reyes found out about the shooting at Moore's house but then said that he called Reyes and told him about it. Detective Thompson testified that the Instagram and cell phone records show no contact between Moore and Reyes before the murder.

As another instance, Moore told Detective Thompson that he had touched the rifle one month before the offense when Reyes offered to sell it to him. Moore made this statement after Detective Thompson told him that he was awaiting DNA test results on the rifle. Detective Thompson informed Moore that he could not have touched the rifle one month before the murder because Reyes did not own the rifle at that time. Moore then told Detective Thompson that, on the night of the murder, he had "played with" the assault rifle and "racked the slide" when Reyes brought it to his home.

Further, during his February 2021 statement, Moore told Detective Thompson statement that he saw "another Mexican guy," who he had never seen before that night, in Reyes car. However, at trial, Moore testified that the person he saw in the car was Ivan Ramirez. Contrary to what he told Detective Thompson, Moore testified that, although he did not know Ramirez well, he did know who he was because they went to school together and he was Reyes's friend.

From the non-accomplice evidence, the jury could have reasonably inferred that Moore lied about some of the circumstances connecting him to Kevin's murder. Lying to police is conduct showing a consciousness of guilt and may be considered as circumstantial evidence of guilt tending to connect a defendant to the offense. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (recognizing that making false statements to hide crime is evidence indicating consciousness of guilt and

26

attempt to cover up crime); *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984) (holding accomplice-witness testimony sufficiently corroborated where, among other suspicious circumstances, defendant lied to police about being with accomplice at time of offense).

Finally, Detective Thompson testified that, after the murder, Moore and his mother moved to Beaumont. He stated that, by using Moore's Instagram posts, he was able to find Moore there in November 2019. By February 2021, Moore and his mother had returned to Houston. The jury could have reasonably inferred that Moore left Houston after the murder to distance himself from the investigation. Evidence of flight can serve to corroborate accomplice testimony. *See Cockrum*, 758 S.W.2d at 582.

We conclude that the non-accomplice evidence supported the jury's determination that the combined weight of this evidence tended to connect Moore to the charged offense of murder. *See Smith*, 332 S.W.3d at 442; *Malone*, 253 S.W.3d at 257; *Cathey*, 992 S.W.2d at 462. We hold that, because a rational jury could have concluded that the combined force of the non-accomplice evidence tended to connect Moore to the offense, the State presented sufficient evidence to corroborate Reyes's accomplice testimony. *See Malone*, 253 S.W.3d at 257; *see also Smith*, 436 S.W.3d at 370 (holding sufficient corroboration shown by evidence of flight,

connection to weapon, and presence in accomplice's company at or near place of offense).

We overrule Moore's first issue.

**Motion to Suppress**

In his second and third issues, Moore challenges the trial court's denial of his motion to suppress his February 2021 statement.

## A. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). We review the trial court's factual findings for an abuse of discretion but review the trial court's application of the law to the facts de novo. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We give deference to the trial court's factual determinations because the trial court is the sole trier of fact and judge of witness credibility and the weight to be given their testimony. *Lerma*, 543 S.W.3d at 190; *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). Our deferential review also applies to the trial court's conclusions regarding mixed questions of law and fact that turn on credibility or demeanor. *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012). We review de novo mixed questions of law and fact that do not turn on credibility and demeanor, as well as purely legal questions. *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

28

If the trial court makes express factual findings, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports the findings. *Valtierra*, 310 S.W.3d at 447; *see State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (recognizing that findings and conclusions may be "stated on the record at the hearing"). "The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, and the trial court's ruling must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023).

## B.      Custodial Interrogation

In his second issue, Moore contends that the trial court abused its discretion when it denied his motion to suppress his February 2021 statement because he did not receive his *Miranda* or statutory warnings while in custody. *See Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966); TEX. CODE CRIM. PROC. art. 38.22.

### 1.      *Applicable Law*

Under *Miranda* and Code of Criminal Procedure article 38.22, statements elicited by custodial interrogation are inadmissible unless the accused is first warned that he has the right to remain silent, his statement may be used against him, and he has the right to hire a lawyer or have a lawyer appointed. *See Miranda*, 384 U.S. at 478–79; TEX. CODE CRIM. PROC. art. 38.22. Article 38.22 also requires warning the

29

accused that he has the right to terminate the interview at any time. *See* TEX. CODE CRIM. PROC. art. 38.22, § 2(a)(5). "Custody" for purposes of article 38.22 is consistent with the meaning of "custody" for purposes of *Miranda*. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007).

"It is the defendant's initial burden to establish that [his] statement was the product of custodial interrogation." *Wexler v. State*, 625 S.W.3d 162, 168 (Tex. Crim. App. 2021). A custody determination requires a court to evaluate (1) the circumstances of the interrogation and (2) whether a reasonable person would have felt that they were not free to leave. *Id.* at 167. "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of movement of a degree associated with arrest. *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). "The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that [his] freedom of movement was restricted to the degree associated with a formal arrest." *Id.*

The "reasonable person" standard presupposes an innocent person. *Id.* A "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see Wexler*, 625 S.W.3d at 168.

In *Dowthitt v. State*, the Court of Criminal Appeals outlined four general situations that may be custodial. 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). The first three situations occur when (1) the suspect is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the suspect that he cannot leave; or (3) law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted. *Wexler*, 625 S.W.3d at 167–68 (citing *Dowthitt*, 931 S.W.2d at 255). For the first three situations, a suspect's freedom must be restricted "to the degree associated with an arrest," not just that of an investigative detention. *Id.* at 168. The fourth situation occurs when probable cause has been manifested to the suspect, law enforcement did not tell the suspect he can leave, and, considering the surrounding circumstances, a reasonable person would believe he is restricted to a degree associated with arrest. *See id.* To make that determination, courts must examine "the totality of the circumstances to determine whether a reasonable person would have believed that he was under restraint to the degree associated with a formal arrest." *State v. Saenz*, 411 S.W.3d 488, 497 (Tex. Crim. App. 2013) (citing *Dowthitt*, 931 S.W.2d at 255).

### 2.    *Analysis*

On appeal, Moore disagrees with the trial court's oral finding that he was "not in custody" when he gave the February 2021 statement. Moore acknowledges that

he voluntarily met with Detective Thompson but asserts that, under the fourth *Dowthitt* situation, Detective Thompson's manifestation of probable cause, plus other circumstances, turned a noncustodial interview into a custodial one. *See Wexler*, 625 S.W.3d at 168.

As he did at the suppression hearing, Moore asserts that he was in custody when he gave his statement because Detective Thompson told him that "eventually [he was] going to get charged." Moore also points to statements by Detective Thompson conveying that he thought Moore, along with Reyes, was responsible for Kevin's murder. Detective Thompson explained to Moore that Reyes had told him a "wild story" implicating Moore in Kevin's murder and said that he had no reason not to believe Reyes, who had no motive and had admitted to his own involvement in the offense. Detective Thompson told Moore, "[Y]ou obviously [are] involved with this, your house just got shot up. You thought it was Marco[s]. You thought Marco[s] still lived at that house on Brentwood. And it was the wrong house." He indicated that Moore's claim that Reyes had committed the shooting as a favor to him was not credible.

Moore asserts that the foregoing statements combined with other statements by Detective Thompson—including his statements that Ramirez said that Moore was at Reyes's house on the night of the shooting and that Detective Thompson believed Moore was the passenger in the vehicle who fired the shots—"were sufficient to

32

manifest that Det. Thompson had probable cause to believe [he] committed the offense of felony murder." Even if we agree, the manifestation of probable cause "will not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *McCulley v. State*, 352 S.W.3d 107, 116 (Tex. App.—Fort Worth 2011, pet. ref'd) (citing *Dowthitt*, 931 S.W.2d at 255); *see Wilson v. State*, 442 S.W.3d 779, 786 (Tex. App.—Fort Worth 2014, pet. ref'd) ("[P]robable cause alone does not automatically establish custody; other circumstances must also combine to lead a reasonable person to believe that he is not free to leave and is under arrest.").

We note that courts have held that a suspect was not subject to custodial interrogation even when the police made statements to a suspect similar to those cited here. *See Wilson*, 442 S.W.3d at 785–86 (holding that suspect was not in custody despite police's statement to him that he was "going to get charged with it; there's no doubt about that" where police had not suggested suspect was under arrest but had instead suggested that "they were still building their case against him); *see also Estrada v. State*, 313 S.W.3d 274, 290, 293–95 (Tex. Crim. App. 2010) (holding defendant was not subject to custodial interrogation even though detective accused defendant of killing complainant during interview); *Houston v. State*, 185 S.W.3d 917, 921 (Tex. App.—Austin 2006, pet. ref'd) (holding defendant had not been in

custody during interview where officer "conveyed the strength of the State's case" to suspect and told him not to commit any more robberies).

As "other circumstances" demonstrating custody, Moore points out that he was the focus of the murder investigation, the doors to Detective Thompson's vehicle were closed, and Detective Silva was in the back seat. However, "being the 'focus' of an investigation does not necessarily render a person 'in custody.'" *Gardner v. State*, 306 S.W.3d 274, 293 (Tex. Crim. App. 2009). And courts have determined that circumstances analogous to those cited by Moore do not rise to the level associated with a formal arrest. *See Wilson*, 442 S.W.3d at 785 (concluding that conducting interview "in a room with no windows, with the door shut, and in close quarters to two police officers [did] not rise to the degree associated with a formal arrest"); *Garza v. State*, 34 S.W.3d 591, 596–97 (Tex. App.—San Antonio 2000, pet. ref'd) (concluding that interview was non-custodial even though suspect "was interviewed in a small room with the door closed").

When considering the totality of the circumstances surrounding the interrogation, numerous objective facts support the trial court's finding that Moore was not in custody: (1) Moore initiated contact with Detective Thompson in response to a call placed to his mother; (2) Moore agreed to meet Detective Thompson; (3) Moore rejected Detective Thompson's request to meet at the sheriff's office but offered to meet at a different location; (4) Moore selected the time and place of the

34

meeting; (5) Moore texted Detective Thompson the address of a drugstore where he wanted to meet; (6) Moore drove his own vehicle to the drugstore; (7) Detective Thompson met Moore in the drugstore parking lot in his unmarked, county-owned car; (8) Moore got out of his vehicle and into the front seat of Detective Thompson's car; (9) the interview occurred in a public parking lot; (10) the car's doors remained unlocked; (11) Moore was never handcuffed; (12) Moore was never told that he was not free to leave; and (13) at the end of the interview, Moore left in his own vehicle.

In addition, neither Detective Thompson nor Detective Silva told Moore that he was under arrest or that arrest was imminent. To the contrary, Detective Thompson made statements indicating that he was still in the process of investigating Moore. He told Moore that he needed to know what happened on the night of the shooting. He urged Moore to tell the truth and said that he was "try[ing] to get [his] side of the story." He asked Moore to take a polygraph test to eliminate himself as a suspect. Even Detective Thompson's statement that Moore would "eventually" be charged suggested a future arrest at an undetermined time rather than a present state of formal arrest. *See Wilson*, 442 S.W.3d at 785.

Finally, a review of the entire audio-recorded interview reveals that both Moore and the detectives made statements reflecting their beliefs that Moore was free to leave when the interview concluded. *See id.* at 786 (recognizing that both appellant and police made statements during interview reflecting that both sides

35

believed appellant was free to leave after interview); *see also Estrada*, 313 S.W.3d at 295 (noting that appellant stated several times during five-hour interview that he wanted to go home and citing *State v. Carroll*, 645 A.2d 82, 88 (N.H. 1994) for proposition that "defendant's statement that he 'want[ed] to go home' suggests 'that the defendant himself believed that he could have left if he so chose'").

During the interview, Detective Thompson told Moore, "I need to know everything *before you leave*." (Emphasis added.) When discussing the polygraph, Detective Thompson told Moore that, if he passed the test, he "could go on about [his] business." Moore refused to take the polygraph, stating, "I got better stuff to do tonight." Moore also said that he could not take the polygraph because he had been to a clinic and needed to take some medicine. Toward the end of the interview, Detective Thompson asked Moore if he was done: "Okay. All right, man. All right. Anything else you'd like to add? You're done?" And Detective Silva asked Moore if, *when he got home*, he could look on social media to find the person that he claimed he saw in the car with Reyes on the night of the murder. (Emphasis added.)

After considering the totality of the circumstances surrounding Moore's statements and viewing the evidence and all reasonable inferences in the light most favorable to the trial court's ruling, we conclude that the trial court reasonably determined that a person in Moore's situation would not have considered himself under restraint to the degree associated with an arrest. The evidence supports the

trial court's finding that Moore was not in custody when he gave the February 2021 statement. As a result, neither Moore's *Miranda* nor statutory rights were triggered. We hold that the trial court did not abuse its discretion by denying Moore's request to suppress his statement on the ground that he was in custody and not informed of his rights.

We overrule Moore's second issue.

## C.     Voluntariness Challenge

In his third issue, Moore challenges the trial court's admission of his February 2021 statement on the ground that he involuntarily made the statement as a result of Detective Thompson's "threats" that Moore's mother "would get into trouble" if she had lied about Moore staying at home on the night of the shooting. The State asserts that Moore did not preserve the issue because he never objected to the admission of his statement on this ground in the motion-to-suppress proceedings, nor did he separately object on this ground before the statement was admitted into evidence during trial. We agree with the State.

### *1.     Relevant Background Facts*

In his motion to suppress, Moore challenged the voluntariness of his statement on the ground that the officers "used misstatement, deception and trickery to get [him] to make the statement, in that they told [him] that unless he talked to them at that time and made a statement, that he would not be able to make a statement at all

37

after that[.]" At the suppression hearing, Moore testified that he falsely stated to Detective Thompson that he told Reyes to shoot up the cars. He testified that he made the false statement because he felt "scared" and "intimidated." He explained that he "felt [he] had to tell [Detective Thompson] something to get him to back off and let [him] go about [his] day." Moore said that Detective Thompson did not believe him when he said that he had "nothing to do with [the shooting]" and that Detective Thompson "just kept grilling [him] relentlessly." Moore agreed that he "told [Detective Thompson] what he wanted to hear to get out of there." In his closing argument at the suppression hearing, Moore argued that his statement had not been voluntary because "he was in fear, scared, [and] intimidated." Detective Thompson's remarks during the interview that Moore's mother might "get in trouble" were not mentioned during the suppression hearing.

Ruling the that the statement was admissible, the trial court denied the motion to suppress. The court found that "the statement was made freely and voluntarily," "that there were no threats," and that "[t]here was not any intimidation, nor were any promises made."

Moore also did not object during trial to the admission of his statement based on involuntariness due to threats against his mother. Instead, when the State offered Moore's recorded statement during Detective Thompson's testimony, Moore indicated that he "renew[ed] [the] same objections" that he made had "outside the

presence of the jury." The trial court confirmed that its "rulings [were] still the same."

After the audio-recorded statement was admitted into evidence, Moore asked Detective Thompson on cross-examination if he remembered "mention[ing] . . . statements about his mother getting in trouble." Detective Thompson answered affirmatively. But nothing more was mentioned about the remarks during Detective Thompson's testimony.

After Detective Thompson's testimony concluded, the State asked that a transcript of Moore's oral statement—which had been offered as a demonstrative exhibit—be included in the record for appellate purposes.[5] Moore did not object to the demonstrative exhibit's inclusion in the record but stated that he "[did] not want to waive [his] objections to what we had outside the presence of the jury," thereby seeking to preserve the objections that he raised to the admission of the statement in the suppression proceedings. The State then rested its case-in-chief.

The defense called Moore to testify. He stated that Detective Thompson told him that his mother could "get in trouble" related to providing an alibi for him. He also testified that his admission to Detective Thompson that he had told Reyes to shoot up the cars was false. When asked why he made the false admission, Moore testified, "Because I felt threatened. [Detective Thompson] was threatening my

---

[5]     The record reflects that the trial court later admitted the transcript into evidence.

mother. He wouldn't—basically, like, he wouldn't let me leave. I felt like I had to tell him something so he would excuse me from the vehicle." The defense did not attempt to re-raise its prior objections to the admissibility of Moore's statement to add this new, additional ground.

The jury charge included an instruction pursuant to Code of Criminal Procedure article 38.23. *See* TEX. CODE OF CRIM. PROC. art. 38.23 (providing that no evidence obtained in violation of constitution shall be admitted against accused and that, "[i]n any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained"). In closing arguments to the jury, each side mentioned the alleged threats to Moore's mother in conjunction with applying the article 38.23 instruction. As the State points out in its brief, "The first and only time the parties litigated any mention of threats to [Moore's] mother was *on the merits* in closing argument *to the jury* for Article 38.23 purposes."

### 2. *Preservation of Involuntariness Complaint*

To preserve a complaint about the admission of evidence for appellate review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling. TEX. R. APP. P. 33.1(a)(1)(A).

Here, Moore challenged the admissibility of his oral statement by filing a motion to suppress.

An appellant's assertion of grounds for suppression raised in an appellate court must comport with his articulated grounds for suppression presented in the trial court, or the grounds are not preserved. *See* TEX. R. APP. P. 33.1(a)(1); *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005). Moore's theory on appeal—that his statement was involuntary because Detective Thompson threatened his mother—does not comport with the involuntariness grounds that he asserted in his written motion to suppress, at the suppression hearing, or in any other objections advanced in the trial court. Nonetheless, Moore asserts that we can consider his trial testimony—in which he stated that he made a false admission due to threats against his mother—to conclude that the trial court abused its discretion in denying his motion to suppress and in admitting his statement. To support his argument, Moore points out that, although an appellate review of a trial court's suppression ruling is ordinarily limited to the evidence adduced at the suppression hearing, an appellate court may consider evidence adduced at trial when the parties consensually relitigated the suppression issues during trial on the merits. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). Moore's reliance on that principal is misplaced here. Moore's appellate issue was not an issue raised in the suppression proceedings. Accordingly, we cannot consider Moore's testimony as a basis to hold

41

that the trial court erred in denying his motion to suppress. We hold that Moore's appellate issue regarding the involuntariness of his statement was not preserved. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Swain*, 181 S.W.3d at 365; *see also Smith v. State*, 532 S.W.3d 839, 841 (Tex. App.—Amarillo 2017, no pet.) ("[T]he grounds [for suppression] urged below do not comport with those urged on appeal, and that effectively waives the latter as basis for reversal.").

We overrule Moore's third issue.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).